**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTHONY SARLO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 08 CV 2194** |
| **v.** | ) | |
| | ) | **Judge Lefkow** |
| **AL WOJCIK, DAVID DONOVAN and,** | ) | |
| **DAN CAREY** | ) | **Magistrate Judge Valdez** |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION TO DISMISS</u>**

Defendants Al Wojcik, David Donovan and Dan Carey, through their attorney, Mara S.

Georges, Corporation Counsel of the City of Chicago, and pursuant to Federal Rules of Civil

Procedure 12(b)(6), submit the following memorandum of law in support of their motion to

dismiss the complaint filed by plaintiff in its entirety.

**<u>INTRODUCTION</u>**

Plaintiff Anthony Sarlo ("plaintiff") is a City of Chicago ("City"employee who works in

the Department of General Services as a motor truck driver.  (Compl. ¶¶ 1,7 (attached hereto as

Exhibit A)).  Sarlo was on medical leave from August 2006 to October 2006. Ex. A, ¶ 8.

Plaintiff alleges that his regular assignment as a motor truck driver had been filled in his absence,

and that when he returned, he was assigned to a different location. Exh. A, ¶ 9.  Plaintiff claims

that his original assignment was filled by someone with political connections, Ex. A, ¶¶ 9-10,

and that after he reported this to the City, Al Wojcik, David Donovan and Dan Carey retaliated

against him for his report.  Ex. A, ¶ 32.  Plaintiff alleges that Wojcik required him to work on the

weekend when he was not scheduled. Ex. A, ¶¶ 16-17.  Plaintiff admits that he did not work on

Saturday, July 14, 2007[1] and that he was given a two-day suspension for failure to report to work. Ex. A. ¶ 24. Plaintiff further alleges that Daniel Carey gave him an "oral warning" that a July 12, 2008 conversation between Plaintiff and Wojcik "got too loud." Ex. A, ¶18. Plaintiff further claims that he was given a three-day suspension for the July 12, 2007 incident with Wojcik. Ex. A, ¶¶ 23, 26, 27, 31.

On April 17, 2008, plaintiff filed a two-count complaint under 42 U.S.C. § 1983, alleging that defendants' conduct violated his First and Fourteenth Amendment rights under the United States Constitution. Ex. A, ¶ 5.

## FEDERAL RULES OF CIVIL PROCEDURE 12(b)(6) MOTION TO DISMISS STANDARDS

When considering a 12(b)(6) motion, the court must assume all well-pleaded allegations in the complaint are true and must construe them in a light most favorable to the plaintiff. Alexander v. City of Chicago, 994 F.2d 333, 335 (7th Cir. 1993). The court is not, however, "obliged to accept as true legal conclusions or unsupported conclusions of fact." Hickey v. O'Bannon, 287 F.3d 656, 658 (7th Cir. 2002). The court is also not required to "ignore any facts set forth in the complaint that undermine the plaintiff's claim." LeBlang Motors, Ltd. v. Subaru of Am., Inc., 148 F.3d 680, 690 (7th Cir. 1998) (citations omitted). In deciding this motion, the court can consider any documents incorporated or referenced in the complaint. See Tierney v. Vahle, 304 F.3d 734, 738 (7th Cir. 2002); Menominee Indian Tribe of Wis. v. Thompson, 161 F.3d 449, 456 (7th Cir. 1998), cert. denied, 526 U.S. 1066, 119 S. Ct. 1459 (1999). A motion to dismiss should be granted if the complaint fails to state a claim that entitles plaintiff to relief.

---

[1] Plaintiff mentions the date "Saturday, July 13, 2007" in his complaint. However, it appears that plaintiff is referencing Saturday, July 14, 2007.

Corcoran v. Chicago Park Dist., 875 F.2d 609, 611 (7th Cir. 1989).

**SUMMARY OF ARGUMENT**

Plaintiff's complaint should be dismissed.  First, plaintiff's allegation regarding his alleged reassignment in October 2006 is barred by the accord entered in Shakman v. Chicago, 69 CV 2145. (Agreed Settlement Order and Accord Summary of Proceedings, Case No. 69 CV 2145, attached hereto as Exh. B).  Second, suing the individual defendants in their official capacity is the same as suing the City.  Thus, the official capacity suits against the individual defendants should be dismissed.  Third, even if plaintiff is suing defendants in their individual capacity, he cannot establish a claim upon which relief can be granted under Section 1983.

**ARGUMENT**

**I.    PLAINTIFF'S ALLEGATION REGARDING HIS ASSIGNMENT IN OCTOBER 2006 IS BARRED BY THE SHAKMAN ACCORD**

Count I of plaintiff's amended complaint is labeled as a claim under Section 1983. However, based on the allegations, it is clear that plaintiff is in fact bringing a Shakman claim. "[T]he nature and character of a pleading are determined from the allegations.  The court is not limited to plaintiffs' theory, but instead must determine if the factual allegations of the complaint are adequate to state a cause of action under any legal theory." Duncan v. Stuetzle, 76 F.3d 1480, 1486 (9th Cir. 1996).  Plaintiff alleges that he was re-assigned in October 2006.  Ex. A, ¶¶ 8,9. This allegation must be dismissed, because this Court lacks subject matter jurisdiction over the Shakman claim.

The Shakman case began in 1969 when the plaintiffs brought suit against a number of governmental entities and officials, including the City and its Mayor, alleging the defendants

3

maintained a patronage system. <u>O'Sullivan v. City of Chicago</u>, 396 F.3d 843, 847-48 (7th Cir.

2005) (internal citations omitted).  In 1972, a Consent Judgment was entered prohibiting the

defendants from "conditioning, basing or knowingly prejudicing or affecting any term or aspect

of governmental employment, with respect to one who is at the time already a government

employee, upon or because of any political reason or favor" ("1972 Consent Judgment"). <u>Id.</u> at

848 (internal citation omitted).  In 1983, another Consent Judgment was entered, which

incorporated the 1972 Consent Judgment's prohibitions and extended those prohibitions to

include the City's hiring practices ("1983 Consent Judgment"). <u>Id.</u> at 848-49 (internal citations

omitted).  Both Consent Judgments specifically empower the Federal District Court to enforce its

terms. <u>Id.</u>

On November 11, 2001, the <u>Shakman</u> plaintiffs filed a Motion For Entry of Rule to Show

Cause Why the City of Chicago and Its Mayor Should Not Be Held in Civil Contempt of Court

and Various Relief Granted for alleged violations of the 1972 and 1983 Consent Judgments (Exh.

B., p. 1).  The parties ultimately entered into the <u>Shakman</u> Accord, approved by the Court on

May 31, 2007 (<u>Id.</u>).  The Accord states, in part, "the remedy provided in this Accord is the

**exclusive remedy** for Class Members seeking remedies for claims under both the 1972 and 1983

Consent Judgments based on events occurring prior to the entry of the Accord who fail to opt out

as provided herein." (<u>Id.</u>, p. 4 (emphasis added)).  The <u>Shakman</u> Accord prohibits:

> (1)    conditioning, basing or knowingly prejudicing or affecting any term or
> aspect of governmental employment (other than for exempt positions) or offering
> employment (whether to a prospective or current City employee) based upon or
> because of any political reason or factor, including, without limitation, any
> individual's political affiliation, political support or activity, political financial
> contributions, promises of such political support, activity or financial
> contributions, or such individual's political sponsorship or recommendation; or

(2)     knowingly inducing, aiding, abetting, participating in, cooperating with the commission of any act which is proscribed in [(1)], or threatening to commit any action proscribed in [(1)]. (Id., p. 5).

As a Motor Truck Driver for the City of Chicago, plaintiff is covered by the Shakman Accord and considered a Class Member. (Id., p. 5). Thus, plaintiff's rights under the Shakman Accord are governed solely by the "Claims and Procedures" detailed in the Accord. (Id., p. 16).[2]

Plaintiff's allegation regarding his "re-assignment" in October 2006 pre-dates the entry of the Shakman Accord. Ex. A, ¶¶ 9-10. Thus, plaintiff was required to follow the "claim procedures for alleged past violations pre-dating entry of the Accord," and he was required to submit a Claim Form to the Shakman Decree Monitor ("SDM") within 120 days of May 31, 2007 (entry of the Accord). (Exh. B, pp. 15-21). Plaintiff failed to submit a Claim Form to the SDM before December 31, 2007, and thus his Shakman claim is time-barred.

The purpose of the settlement accord was to "settle claims of unlawful political discrimination in any aspect of employment with the City of Chicago between January 1, 2000 and the date of final approval of the accord." Exh. B, p. 15. The accord received final approval on March 21, 2007. Therefore, plaintiff's allegations regarding his "reassignment" in October 2006 are barred by the Shakman decree.

## II.     PLAINTIFF'S SUIT AGAINST INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES SHOULD BE DISMISSED AS BEING REDUNDANT

A plaintiff bringing a Section 1983 claim is required to "specify whether suit is brought against the defendant in his official capacity or in his individual capacity." Harris v. Board of

---

[2]All covered employees had the right to opt-out of the Shakman Accord. If a Class Member alleged a violation of the 1972 or 1983 Consent Judgments arising between January 1, 2000, and May 31, 2007 (the entry of the Accord), they could opt-out of the "Claims and Procedures" as detailed in the Accord. (Exh. B., p. 16). The opt-out date was "120 days after the final approval of the Accord," which is December 31, 2007 (Id.). Plaintiff did not seek to opt-out of the Accord prior to that date.

Educ. of the City of Chicago, No. 05 C 3892, 2005 WL 2978736, at *3 (N.D. Ill. Nov. 2, 2005)

(citing Hill v. Shelander, 924 F.2d 1370, 1372 (7th Cir. 1991)) (attached hereto as Exhibit C).

The Seventh Circuit has explained that a court should "ordinarily assume that [a defendant] has

been sued in his official capacity and only in that capacity, . . . [and] [i]f a plaintiff intends to sue

public officials in their individual capacities or in both their official and individual capacities . . .

he should expressly so state in the complaint."  Id. (citing Kolar v. Sangamon County of State of

Ill., 756 F.2d 564, 568-69 (7th Cir. 1985)).  Plaintiff does not allege that he is suing the individual

defendants in their individual capacities.  (Ex. A, p. 1, ¶¶ 2-4).  Instead, he alleges that

"Defendants and each of them are or were [sic] at all times relevant herein supervisors in the

department of General Services Bureau of Trades and Engineering."  (Ex. A, p. 1, ¶ 35).

Accordingly, plaintiff sues defendants Al Wojcik, David Donovan, and Dan Carey in their

official capacities.

        An official capacity suit is the same as a suit against the entity of which the employee is

an agent.  DeGenova v. Sheriff of Dupage County, 209 F.3d 973, 974 n.1 (7th Cir. 2000); Jungels

v. Pierce, 825 F.2d 1127, 1129 (7th Cir. 1987).  Here, plaintiff's suit against the defendants in

their official capacities is, in essence, a suit against the City.  Jungels, 825 F.2d at 1129.

Therefore, the individual defendants should be dismissed and the City should be substituted for

them.  Kentucky v. Graham, 473 U.S. 159, 165-166 (1985); Admiral Theater v. City of Chicago,

832 F. Supp. 1195, 1200 (N.D. Ill. 1993).

        Further, official capacity suits are generally a way to plead an action against the

organization which employs the official. Id at 165. Thus, since local government units can be

sued directly; there is no need to bring an official capacity action. See Monell v. Department of

Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). As long as the government entity has notice and an opportunity to respond, "an official capacity suit is, in all respects other than name, to be treated as a suit against the entity." Graham, 473 U.S. at 166, 105 S. Ct. at 3105. For these reasons, the official capacity suits against Al Wojcik, David Donovan, and Dan Carey are "redundant and unnecessary, because they are essentially suits against the city...." Kohn v. Mucia, 776 F. Supp. 348, 356 (N.D. Ill. 1991). Accordingly, the official capacity claims against defendants Al Wojcik, David Donovan, and Dan Carey should be dismissed.

## III.    PLAINTIFF HAS FAILED TO PLEAD AN ACTIONABLE CLAIM AGAINST THE DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES

Plaintiff has not plead facts necessary to establish personal liability under Section 1983. In fact, as previously stated, plaintiff's complaint is silent as to any claims against defendants in their individual capacity. See Exh. A, p. 1, ¶¶ 2-4. Without facts to place the defendants on notice as to whether they are being sued in their individual or official capacity, the assumption is that defendants are being sued only in their official capacity. Harris, 2005 WL 2978736, at *3. Even if plaintiff were suing the defendants in their individual capacity, his claim would fail. Plaintiff must prove two elements in order to successfully advance an individual capacity claim under Section 1983: (1) violation of a right secured by the Constitution and laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). A plaintiff must allege facts in his or her complaint that the defendants were personally involved in the deprivation of his or her constitutional rights. Gossmeyer v. McDonald, 128 F.3d 481, 494 (7th Cir. 1997); See Black v.

7

Lane, 22 F.3d 1395, 1401 (7th Cir. 1994). "An official meets the 'personal involvement'

requirement when he or she acts or fails to act 'with deliberate or reckless disregard of plaintiffs'

rights or if the conduct causing the deprivation occurs at [her] direction or with her knowledge or

consent.'" Black, 22 F.3d at 1401 (internal citation omitted). "Moreover, there must be a 'causal

connection or affirmative link' between the misconduct complained of and the official sued.'"

Mitchell v. Fairman, No. 95 C 3648, 1997 WL 224990, at *2 (N.D. Ill. Apr. 29, 1997) (citing

Estate of Porter by Nelson v. Illinois, 36 F.3d 684, 688 (7th Cir. 1994)) (attached hereto as

Exhibit D). See also Soto v. Johansen, 137 F.3d 980, 981 (7th Cir. 1994).

Al Wojcik, David Donovan and Dan Carey's alleged conduct falls short of fulfilling the

standard for individual liability. While plaintiff alleges that he complained about his

reassignment to Wojcik, and that he was disciplined for failing to work when he admittedly did

not work, this is not conduct sufficient to plead the requisite connection between plaintiff's

complaint and his suspension. Nor are plaintiff's conclusory statements that the "actions of

defendants in filing and pursuing a complaint against Sarlo were in retaliation for his actions in

reporting and complaining about preferential assignments" for people with political influence.

Exh. A, ¶ 33. Such conclusory allegations unsupported by factual assertions "fail even the liberal

standard of Rule 12(b)(6)." Palda v. General Dynamics Corp., 47 F.3d 872, 875 (7th Cir. 1995).

There is nothing alleged in the complaint that connects the employment decisions to suspend

plaintiff for two days and three days to plaintiff's complaint about his re-assignment. Plaintiff

admits that the two day suspension was for failing to work on Saturday, July 14, 2007. Plaintiff

admits that he did not work that day. Plaintiff does not specify who or what entity made the

decision to suspend him for three days following his altercation with Wojcik, but instead claims

that the three defendants "all listed different persons as being present during the short conversation" and seems to suggest that this somehow indicates they were retaliating against plaintiff.  However, plaintiff's allegations do not show that the three individuals' reports were substantially different, and in fact plaintiff alleges that Rich Enault, who is not a defendant in this action, filed a report alleging essentially the same facts as the defendants.

Every adverse employment decision is not a constitutional deprivation under Section 1983.  Because there was no alleged deliberate or reckless disregard of plaintiff's rights or a constitutional deprivation made by either Al Wojcik, David Donovan or Dan Carey, they should be dismissed from the suit with prejudice.

## CONCLUSION

For the foregoing reasons, as well as those stated in their motion to dismiss, defendants Al Wojcik, David Donovan and Dan Carey, respectfully request that this Court dismiss plaintiff's complaint with prejudice.

Respectfully submitted,

MARA S. GEORGES,
Corporation Counsel of the City of Chicago

s/Melanie Patrick Neely
MELANIE PATRICK NEELY
JENNIFER C. ADDISON
Assistants Corporation Counsel

30 N. LaSalle, Suite 1020
Chicago, Illinois 60602
312/744-5114/5122

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

|  |  |
|---|---|
| Anthony Sarlo | ] FILED: APRIL 17,2008 |
|        Plaintiff | ]  08CV 2194 NF |
| Vs | ] JUDGE LEFKOW |
|  | ] MAGISTRATE JUDGE VALDEZ |
| Al Wojcik, David Donovan, Dan Carey | ] |
|        Defendants | ] |

## COMPLAINT

Plaintiff Anthony Sarlo by and through his attorney, Susan P. Malone, complaining of

defendants Al Wojcik, David Donovan and Daniel Carey, states as follows:

### Jurisdiction and Parties

1.  Plaintiff Anthony Sarlo is and was at all times relevant herein employed by the

    City of Chicago, Department of General Services. Sarlo is and was at all times

    relevant herein a resident of the City of Chicago, County of Cook, State of

    Illinois.

2.  Defendant Albert Wojcik is and was at all times relevant herein employed by the

    City of Chicago, Department of General Services and, on information and belief,

    is and was at all times relevant herein a resident of the City of Chicago, County of

    cook, State of Illinois.

3.  Defendant Daniel Carey is and was at all times relevant herein a resident of the

    City of Chicago, County of Cook and State of Illinois and is and was at all times

1



relevant herein employed by the City of Chicago, Department of General Services.

4.  Defendant David Donovan is and was at all times relevant herein a resident of the city of Chicago, County of Cook, State of Illinois and is and was at all times relevant herein employed by the City of Chicago, Department of General Services.

5.  This action is brought to secure redress of rights secured by the first and fourteenth amendment of the United States Constitution pursuant ot the Civil Rights Act of 1864, 42 U.S.C. Section 1983.  All of the actions of the defendants herein were undertaken under color of law.

6.  This Court has jurisdiction of this matter pursuant to the provisions of 28 U.S.C. Section 1332 and 1343

7.  Plaintiff Sarlo is and has been at all times relevant herein employed by the City of Chicago as a motor truck driver.

8.  In August, 2006, Sarlo was injured and was absent from work until October 2, 2006.

9.  Upon his return from his injury leave, Defendant Wojcik told Sarlo that he was being reassigned and that his assigned position had been filled. When Sarlo objected, Wojcik told Sarlo that he was going to reassign Sarlo to a remote location.

10. Shortly thereafter, Sarlo learned that an individual had been hired or transferred to the department who had political connections and influence. Sarlo told Wojcik

that he had learned that this reassignment had occurred because of the political

influence of the new driver.

11. Wojcik threatened Sarlo to watch what he said or he would not have a job.

12. Thereafter, Wojcik would assign Sarlo to duties and responsibilities in excess of

those assigned to other drivers, requiring Sarlo to perform more and more onerous

duties than other drivers.

13. Sarlo informed the inspector general and others of the actions of Wojcik in the

assignment and reassignments of drivers.

14. In March, 2007, Sarlo reported to the Commissioner of the General Services

Department that he believed he had been harassed and retaliated against for good

faith reporting of what he believed to be improper conduct.

15. Defendants were informed of the complaint by Sarlo and were aware of such

complaint.

16. Overtime and weekend work assignments in the Department of General Services

are assigned on a rotating schedule.  For the weekend of July 13-14, 2007, Sarlo

was not due to be assigned weekend work and had made plans with his family.

17. On or about July 12, 2007, Wojcik told Sarlo he would be required to work on

that Saturday. Sarlo informed Wojcik that he had made commitments with his

family for that weekend and that it was not his scheduled date to work. Wojcik

responded that if Sarlo did not work that Saturday, Sarlo would not like what was

going to happen to him.

18. On Friday, July 13, 2007, Sarlo was called into the office of Daniel Carey, who

was acting as the acting head of the bureau of trades and engineering. Carey told

3

Sarlo that he was being given a oral warning regarding the conversation with Wojcik as it had become loud. Sarlo told Mr. Carey that he had told Mr. Wojcik that he would not be able to work the following day due to family obligations and that he did not believe Wojcik ought be speaking to employees in the manner in which he had addressed Sarlo.

19. Carey did not instruct Sarlo that he was required to work.

20. Sarlo did not report to work on Saturday, July 13, 2007. Another individual who had been directed to work that Sunday, July 14, 2007 also did not report to work.

21. Sarlo inquired of his available options regarding Wojcik conduct and was instructed to inquire of the Human Resources section of the Department of General Services.

22. Sarlo went to the Human Resources Department of General Services regarding the conversation he had with Wojcik. He informed Fran Bailey, the Commissioner of Human Resources for the Department that Wojcik had in his view threatened him and acted in an improper manner on July 12, 2007. Bailey responded that she found that "hard to believe" and that she had heard of Sarlo before. When Sarlo asked about his options for recourse, Bailey told him he could file a complaint of violence in the workplace but that if he did so, and the Department believed the complaint was not true, "we will come after you".

23. On July 17, 2007, after being notified of Sarlo's complaint, Wojcik filed a report claiming that five days earlier on July 12, 2007, Sarlo had physically threatened Wojcik during the conversation by pointing his finger at Wojcik from 2 to 3 inches away and that Sarlo had to be physically restrained by another supervisor.

Wojcik named various persons as alleged witnesses to this incident which he stated lasted for two to three minutes.

24. On July 20, 2007, a meeting was held with Bailey in which Sarlo was given a two day suspension for failure to report for work on July 14, 2007 by Wojcik.

25. On July 23, 2007, Sarlo wrote the Commissioner of General Services as he had in March, 2007 requesting review and redress.

26. On August 14,2007, Carey, who had given Sarlo a oral warning for discourtesy and for walking away from Wojcik on July 12, 2007 , filed a report in which he stated that he was present at the July 12, 2007 conversation. Carey stated that Sarlo had to be held back by "many" city employees and that Carey had told Sarlo that he would contact the police.

27. On August 14, 2007, David Donovan filed a report in which he contended that he too had been present at the 2-3 minute conversation and that he had heard Sarlo trying to attack Wojcik and directing Wojcik to "step outside".

28. Neither Donovan nor Carey were present that the conversation between Wojcik and Sarlo on July 12, 2007.

29. On August 14, 2007, Richard Enault filed a report in which he stated that he had entered the area as the conversation between Wojcik and Sarlo began and that he then went to his office and then to Carey's office. He stated that he could hear some yelling and that he and Carey then went to the location of the conversation. Enault contended that he could hear Sarlo "screaming" at Wojcik as he was "held back". .

30. Donovan, Carey, and Wojcik all listed different persons as being present at the short conversation.

31. As a result of the actions and statements of the defendants, Sarlo was suspended for three days.

32. The actions of defendants in filing and pursuing a complaint against Sarlo were in retaliation for his actions in reporting and complaining about preferential assignments and workload for persons with political influence and for complaining of retaliation for such reports

33. As a direct and proximate results of the defendants actions, plaintiff has sustained damage in that plaintiff has lost wages and benefits and has sustained emotional distress, humiliation and embarrassment.

Wherefore Plaintiff requests this Honorable Court to order the following relief

1. That this Court award Plaintiff compensatory damages against defendants and each of them in such amount as may be found by the jury to be sufficient to compensate plaintiffs;

2. That this court award plaintiffs attorneys fees and costs

3. That this court order defendant to cease utilizing political considerations in assignments and promotions and to refrain from retaliating against those who complain of such actions.

4. For such other and further relief as to this Court shall seem just

COUNT II

1-32. Plaintiff repeats and realleges as paragraphs one through thirty two of this

Count II, paragraphs one through thirty two of count I and states

34. Defendants and each of them are relatives of persons who have held elective

   office or been advisors to political figures, are frequent contributors to political

   campaigns and/or serve as precinct captains in the city of Chicago.

35. The Defendants are or were all times relevant herein supervisors in the

   department of General Services Bureau of Trades and Engineering. Under

   defendants supervision of their respective areas at the Bureau of Trades and

   Engineering for many years and continuing through 2007, promotions,

   assignments, transfers and other benefits of employment were given to those with

   political connections and influence.

36. Defendants and each of them participated in and promoted providing promotions,

   preferential assignments and benefits to those with political influence and

   threatening and seeking to discourage employees without such influence from

   opposing their actions.

37. Defendants' actions in retaliating against Sarlo were undertaken with reckless

   disregard of his right to be free from political influence in hiring, promotion and

   assignments within the municipal service.

Wherefore Plaintiff Anthony Sarlo respectfully requests this Honorable Court to

award plaintiff punitive damages in an amount to be determined by the jury sufficient

to punish and deter said defendants.

PLAINTIFFS REQUESTS A JURY TRIAL ON

ALL ISSUES SO TRIABLE

Respectfully submitted


___s/malonelaw@sbcglobal.net

Susan P. Malone

Susan P. Malone
20 N Clark Street
Suite 1725
Chicago, Il 60602
(312) 726-2638

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MICHAEL L. SHAKMAN, PAUL M. LURIE,   )
KENNETH AYERS, ANN M. KING,   )
INDEPENDENT VOTERS OF ILLINOIS-   )
INDEPENDENT PRECINCT ORGANIZATION,   )
MICHAEL SULLIVAN, DARRYN JONES,   )
STUART MAJERCZYK, RICHARD   )
GRAMAROSSA and CONNIE GRAMAROSSA,   )
et al.,   )
  )
  )
        Plaintiffs,   )    Case Number: 69 C 2145
  )
      v.   )    Judge Andersen
  )
  )    Magistrate Judge Schenkier
DEMOCRATIC ORGANIZATION OF COOK   )
COUNTY, THE CITY OF CHICAGO,   )
RICHARD M. DALEY, INDIVIDUALLY AND   )
AS MAYOR OF THE CITY OF CHICAGO,   )
REPUBLICAN STATE CENTRAL   )
COMMITTEE OF ILLINOIS, REPUBLICAN   )
COUNTY CENTRAL COMMITTEE OF COOK   )
COUNTY, et al.,   )
  )
        Defendants.   )

## AGREED SETTLEMENT ORDER AND ACCORD

## SUMMARY OF PROCEEDINGS



# TABLE OF CONTENTS

1. Rule 23 Order ................................................................................................2

   (a) Settlement of Complaint, Motion for Contempt and Eventual Dissolution of Injunction ................................................................................2

   (b) Contingent Final Accord Approval ............................................................2

   (c) Accord Preliminary Approval; Contempt Motion and City Motion to Vacate Become Moot; Rule 23 Procedures and Injunction of Further Complaints ..............2

2. Conditions Precedent to Final Approval of Accord ...............................................3

3. Dismissal of Mayor; Vacate 1983 Consent Judgment as to Mayor ........................3

4. Accord Supersedes and Replaces 1983 Consent Judgment ...................................3

5. Non-Effect of Accord on Other Parties ..............................................................4

6. Status of 1972 Consent Judgment ....................................................................4

7. City Council ..................................................................................................4

I. Prohibited Activities.........................................................................................5

    **A.**   Injunction. ...........................................................................................5

    **B.**   Covered City Employees. ......................................................................5

    **C.**   Recommendations and Definition of Political Reasons and Factors. ...............6

    **D.**   Continued Jurisdiction of the Court; Funding of Shakman Decree Monitor. .....7

    **E.**   Post-Accord Review and Enforcement...................................................8

       (1)   Plaintiffs' Review of Accord Performance. ...........................................8

       (2)   Plaintiffs' Enforcement Actions on Behalf of Class Members Other Than Campaign Candidates. .........................................................................8

       (3)   Waiver by Named Plaintiffs of Enforcement on Behalf of Campaign Candidates. ........................................................................................8

       (4)   Candidate Rights for Post-Accord Acts. ...............................................9

    **F.**   Implementation of New Plan; Continued SDM Monitoring. ........................9

    **G.**   Sunset Procedures...............................................................................10

       (1)   DHR Certification of Substantial Compliance. ......................................10

       (2)   Mayoral Declaration. ........................................................................10

       (3)   SDM's Opinion. ...............................................................................10

       (4)   Conditions to Termination of the Accord. ............................................10

       (5)   Hearing if Negative SDM Opinion. .....................................................11

       (6)   Effective Date of Termination; Pending Arbitration Demands. .................11

(7)    Reinitiating Substantial Completion Process. ...............................................11

(8)    Substantial Compliance Definition. ...............................................11

H.    Post-Accord Relief and Defenses. ...............................................12

(1)    Accord Claims and Other Relief. ...............................................12

(2)    Waiver of Challenge to Accord Validity and Class Member Standing; Preservation of Other Defenses. ...............................................13

II. The New Plan. ...............................................13

A.    New Plan to Replace Detailed Hiring Plan. ...............................................13

B.    New Plan Development. ...............................................13

C.    Interim New Plan Components. ...............................................13

D.    Impasse Resolution for New Plan Development. ...............................................14

E.    Senior Manager Hiring Process. ...............................................14

F.    Private Secretary Hiring Process. ...............................................14

G.    Exemptions. ...............................................14

III. Claims Procedure for Alleged Past Violations Pre-Dating Entry of the Accord. ...............................................15

A.    Claim Fund. ...............................................15

B.    Notice. ...............................................15

C.    Opt-Out Rights. ...............................................16

D.    Certain Named Plaintiffs Incentive Awards. ...............................................16

E.    Claim Forms. ...............................................17

1.    Contents. ...............................................17

2.    Interpretation. ...............................................18

3.    Cooperation of City and Claimants. ...............................................18

4.    Eligibility Period. ...............................................18

5.    Availability of Claim Forms. ...............................................18

6.    Claim Determination. ...............................................19

7.    Matters to Be Considered. ...............................................19

8.    Notice of SDM Decision. ...............................................19

F.    Disbursement of Awards. ...............................................19

G.    Remainder to the City. ...............................................20

H.    Release. ...............................................20

1.    Released Claims. ...............................................20

2.    Released Parties. ...............................................20

    3.   Final Settlement of Claims. ..................................................................20

    4.   Effect of Release. .................................................................................21

IV. Procedure for Alleged Violations Occurring After the Entry of the Accord. .........................21

    A.   Accord Complaint Process ...................................................................21

        (1)   Making an Accord Complaint. ..................................................21

        (2)   Availability of Accord Complaint Forms. ..................................22

        (3)   IGO Investigation. ...................................................................23

        (4)   Distribution to SDM. ...............................................................23

        (5)   Cooperation with IGO. ............................................................24

        (6)   Timing of IGO Investigation. ..................................................24

        (7)   Sustained Cases. .....................................................................24

        (8)   Non-Sustained Cases. ..............................................................25

        (9)   Quarterly Reports. ...................................................................25

        (10)  Tolling During IGO Investigation. ..........................................25

    B.   Arbitration Procedure. .........................................................................26

        (1)   Written Arbitration Request Due Date. .....................................26

        (2)   Settlement Offer. .....................................................................26

        (3)   Timing for Arbitration. ............................................................26

        (4)   Arbitrator's Fees; Representatives of Complainant. ..................27

        (5)   Selection of Arbitrator. ...........................................................27

        (6)   Governing Rules. ....................................................................27

        (7)   Arbitrator's Decision. ..............................................................27

        (8)   Finality of Decision. ................................................................28

        (9)   Waiver. ...................................................................................29

        (10)  Audit Documentation. .............................................................29

V. No Admission. .................................................................................................29

VI. No Retaliation. ...............................................................................................29

VII. Compliance Reports to Court. ........................................................................29

VIII. Attorneys' Fees. ...........................................................................................30

IX. Termination of the Accord. .............................................................................30

    A.   Effect of Non-Approval. .....................................................................30

    B.   Effect of Termination. ........................................................................30

X. Entire Agreement. ...........................................................................................30

In 1972, Defendants the City of Chicago (hereinafter "the City") and its Mayor entered into a Consent Judgment which, among other things, prohibited Defendants from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." On June 20, 1983, the City entered into a Consent Judgment which incorporated the 1972 Consent Judgment's prohibitions and extended those prohibitions to include the City's hiring practices, with certain exclusions. The 1983 Consent Judgment specifically empowers this Court to enforce the terms of both the 1972 Consent Judgment and the 1983 Consent Judgment. On November 11, 2001, the Plaintiffs filed a Motion For Entry of Rule to Show Cause Why the City of Chicago and Its Mayor Should Not Be Held in Civil Contempt of Court and Various Relief Granted ("November 11, 2001 Motion") for alleged past violations of the 1972 and 1983 Consent Judgments. The Court granted the November 11, 2001 Motion in part and the City appealed. On November 17, 2005, the United States Court of Appeals for the Seventh Circuit vacated and remanded the matter which is now pending before this Court. On January 24, 2002, the City filed a Motion seeking to vacate the 1983 Consent Judgment. The Court denied that Motion and the City appealed that decision to the United States Court of Appeals for the Seventh Circuit. On July 26, 2005, the Plaintiffs filed an Application to Hold the City of Chicago and Its Mayor in Civil Contempt ("July 26, 2005 Application") for alleged past violations of the 1972 and 1983 Consent Judgments. On August 2, 2005, the Court appointed a Shakman Decree Monitor and her counsel (collectively referred to as "SDM") "to ensure future compliance" with the Court's prior orders in Shakman et al. v. The Democratic Organization of Cook County, et al., Case No. 69 C 2145. On October 24, 2005, the United States Court of Appeals for the Seventh Circuit issued a decision reversing the denial of the

City's Motion to Vacate and remanding to the District Court with instructions. On January 11, 2006, the Plaintiffs filed a Second Amended Complaint and the City and the Mayor filed a Motion to Dismiss the Second Amended Complaint along with a renewed Motion to Vacate the 1983 Consent Judgment.

The City of Chicago and the Plaintiffs (collectively "the Parties") agree as follows:

1.    Rule 23 Order.  The Court shall enter an order in the form attached as Exhibit A provisionally certifying the additional classes in the Second Amended Complaint as follows: (i) all past employees and applicants for employment with the City of Chicago to the date of the entry of this Accord pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) and (ii) all employees or applicants for employment with the City of Chicago during the life of the Accord. The order shall appoint current class counsel as counsel for the additional classes.

(a)    Settlement of Complaint, Motion for Contempt and Eventual Dissolution of Injunction.  Effective when finally approved by the Court, this Accord fully and finally resolves all of Plaintiffs' claims against the City and the Mayor in the Second Amended Complaint and the Plaintiffs' motion to hold the City and its Mayor in civil contempt and is intended to have res judicata effect regarding those Plaintiffs' claims and that Plaintiffs' motion. Effective when the Accord is finally approved by the Court, Plaintiffs covenant not to sue the City or its Mayor regarding the claims resolved by this Accord.  Upon the termination of this Accord pursuant to Section I.F, all injunctive provisions of the Accord shall dissolve and all obligations of the City under this Accord shall cease.

(b)    Contingent Final Accord Approval.  This agreement to certify the above classes is contingent upon final approval of the Accord (which has become not further appealable).  No certified settlement class or other class of applicants and employees pursuant hereto, or other agreement set forth herein, shall remain effective if the Accord is not approved and such approval does not become final and not further appealable.  In that event, the terms of this Accord, including any agreed or certified settlement classes, shall be without force or effect for any purpose.

(c)    Accord Preliminary Approval; Contempt Motion and City Motion to Vacate Become Moot; Rule 23 Procedures and Injunction of Further Complaints.  The order also preliminarily approves the Accord, denies as moot the Plaintiffs' November 11, 2001 Motion and July 25, 2006 Application to hold the City and its Mayor in civil contempt and the City's motion to vacate the 1983 Consent

Judgment, sets forth procedures for notice, hearing and final approval of the Accord, and preliminarily bars and enjoins the institution and prosecution, by class members who do not opt out of this Accord, of any claims against the City and the Mayor that were or could have been asserted in the underlying Action.

2.    Conditions Precedent to Final Approval of Accord. Prior to final approval of the

Accord by the Court:

(a)    the Mayor will have signed an Executive Order, a draft of which is attached as Exhibit B and which shall be finalized within 30 days, (i) forbidding unlawful political discrimination in all aspects of employment with the City except with respect to exempt positions and endorsing the Accord and (ii) requiring City employees to report unlawful political discrimination to the Inspector General's Office directly and without undue delay;

(b)    the City Council will have approved all elements of the Accord which include, but are not limited to (i) the $12,000,000 of funding for Claims awards pursuant to Section III, (ii) claims administration pursuant to Section III, (iii) the SDM monitoring and procedures set forth in Sections I.E. and III, and (iv) the Inspector General's investigation and remedial procedures set forth in Section IV; and

(c)    the Inspector General will have agreed to investigate claims that arise after the Court's final approval of the Accord.

3.    Dismissal of Mayor; Vacate 1983 Consent Judgment as to Mayor. Effective upon

final approval of the Accord, the Mayor of Chicago, Richard M. Daley, is dismissed with

prejudice as a party in his individual and official capacities and all claims asserted against the

Mayor in the Second Amended Complaint are dismissed with prejudice. The 1983 Consent

Judgment shall be vacated as to Mayor Richard M. Daley in his individual and official capacity

and to successor Mayors when the Court finds that Richard M. Daley and the City have

presented and the Court has approved the "New Plan" (for all categories of covered employees

except fire and police) provided for in Section II.

4.    Accord Supersedes and Replaces 1983 Consent Judgment. This Accord provides

for the superseding and replacement of the 1983 Consent Judgment with this Agreed Settlement

Order with regard to the City and Plaintiffs may not petition the Court to have it reinstated after the Accord has been finally terminated.

5.    <u>Non-Effect of Accord on Other Parties</u>. This Accord shall have no effect on non-City parties to other judgments or orders, or persons who opt out of the Accord pursuant to the procedure ordered for submission of this Accord for judicial approval (collectively, "Other Parties"). This Court retains jurisdiction to hear and determine all claims and issues involving the validity of the 1983 Consent Judgment or the Accord brought in proceedings initiated by Other Parties.

6.    <u>Status of 1972 Consent Judgment</u>. The 1972 Consent Judgment remains in full force and effect after the Court's approval of the Accord. However, the remedy provided in this Accord is the exclusive remedy for Class Members seeking remedies for claims under both the 1972 and 1983 Consent Judgments based on events occurring prior to the entry of the Accord who fail to opt out as provided herein. The City may petition the Court to vacate the 1972 Consent Judgment at any time, including prior to, during, at the time of termination of the Accord, or after the termination of the Accord.

7.    <u>City Council</u>. The City Council of the City of Chicago and the Aldermen are not, and have never been, named parties to the 1972 and 1983 Consent Judgments, nor are they named parties to the underlying Action or this Accord. Plaintiffs further agree they will not add any new defendants employed by the City or officials of the City to the Second Amended Complaint or to the Accord. The foregoing is without prejudice to Plaintiffs' rights to enforce the Accord.

The Parties further agree and the Court hereby Orders as follows:

I.    **Prohibited Activities.**

    A.    <u>Injunction</u>.  Other than for exempt positions, the City, its present and future officers, members, agents, servants, employees, attorneys and those acting at the direction of and/or in concert with such persons are permanently enjoined from directly or indirectly, in whole or in part:

        (1)    conditioning, basing or knowingly prejudicing or affecting any term or aspect of government employment (other than for exempt positions) or offering employment (whether to a prospective or current City employee) based upon or because of any political reason or factor, including, without limitation, any individual's political affiliation, political support or activity, political financial contributions, promises of such political support, activity or financial contributions, or such individual's political sponsorship or recommendation; or

        (2)    knowingly inducing, aiding, abetting, participating in, cooperating with the commission of any act which is proscribed in Section I.A(1), or threatening to commit any action proscribed in Section I.A(1).

    B.    <u>Covered City Employees</u>.  The prohibitions set forth in Section I.A(1) and (2) above shall extend to all employment by or for the City, or by or for any person or entity under the direction and control of the City, except for those positions excluded by the Accord.  For this purpose "employment" means the relationship that constitutes employment at common law by the City or by or for any person or entity under the direction and control of the City except for those positions excluded by the Accord and includes probationary, temporary, part time and permanent employment, whether pursuant to a written contract or otherwise.  The prohibitions set forth in Section I.A(1) and (2) above do not apply to the retention

of independent contractors by the City or employment by other agencies not under the direction and control of the City, including but not limited to, the Chicago Transit Authority, the Chicago Public Schools, the Chicago Housing Authority, the Board of Elections, the Public Buildings Commission, or the Chicago Park District (which is subject to separate judgments in this case).

C.    <u>Recommendations and Definition of Political Reasons and Factors</u>.  Nothing in the Accord or the New Plan shall limit the right of any citizen, including elected officials, to make recommendations not based on political reasons or factors to personnel involved in making employment decisions on behalf of the City.  In the case of hiring for positions that are not exempt from the requirement that political reasons or factors be excluded from consideration, recommendations from public office holders or political party officials that are based on their personal knowledge of the person's work skill, work experience or other job-related qualifications are permitted and may be considered.  Recommendations based on political reasons or factors shall not be given any effect, and shall be reported as provided in the New Plan.  As used herein, "political reasons or factors" include:

1.    Recommendations for hiring, promotion or other employment terms for specific persons from public office holders or political party officials that are not based on personal knowledge of the person's work skills, work experience or other job-related qualifications.

2.    The fact that the person worked in a political campaign or belongs to a political organization or political party.  Or the fact that the person chose not to work in a political campaign or to belong to a political organization or a political party.  The mere

6

fact that a person worked for a political campaign for elective office does not prohibit consideration of a recommendation related to that person insofar as the basis for that recommendation relates to the person's relevant work experience.

      3.     The fact that the person contributed money, raised money or provided something else of value to a candidate for public office or a political organization. Or the fact that the person chose not to contribute or raise money for a candidate for public office or a political organization.

      4.     The fact that the person is a Democrat or a Republican or a member of any other political party or group. Or the fact that the applicant is not a member.

      5.     The fact that the person expressed views or beliefs on political matters such as what candidates or elected officials he or she favored or opposed, what public policy issue he or she favored or opposed, or what views on government actions or failures to act he or she expressed.

**D.**    <u>Continued Jurisdiction of the Court; Funding of Shakman Decree Monitor.</u>  The Court shall retain jurisdiction for purposes of enforcement and ongoing monitoring of the City's compliance with the Accord, including monitoring by the SDM and the SDM's counsel and staff, until such time as the Accord shall terminate, as described in Section I.E. During such period, the City shall continue to pay the reasonable fees and expenses of the SDM and her counsel and staff as may periodically be adjusted with Court approval or with agreement by the City, pursuant to the process previously ordered by the Court.

The SDM will prepare and file semi-annual reports with the Court, and copies will be provided to counsel for the parties. The parties may provide input to the Court regarding information contained in the SDM's reports.

**E.**     Post-Accord Review and Enforcement.

(1)     Plaintiffs' Review of Accord Performance. Plaintiffs shall be entitled to review the City's performance under the Accord and the new hiring and promotion plan described in Sections II.A-C (the "New Plan") through counsel of their choice, may present matters to the Court, including but not limited to, suggestions or objections to any proposal or motion for termination or modification to the Accord or the New Plan, and may petition the Court for costs and attorneys' fees incurred as part of their reasonable and appropriate review hereunder.

(2)     Plaintiffs' Enforcement Actions on Behalf of Class Members Other Than Campaign Candidates. Plaintiffs may also seek enforcement of the Accord and New Plan (although as provided in the next paragraph Michael L. Shakman and Paul Lurie may not seek enforcement on behalf of individual candidates or slate of candidates in connection with any particular campaign for public office), through counsel of their choice on behalf of Class Members for matters arising after the final approval of the Accord ("Enforcement Actions"). In the event Plaintiffs prevail in any Enforcement Actions, the City shall pay the Plaintiffs' reasonable attorneys' fees and costs incurred in any such Enforcement Actions.

(3)     Waiver by Named Plaintiffs of Enforcement on Behalf of Campaign Candidates. Although Michael L. Shakman and Paul M. Lurie have not been dismissed as Plaintiffs in the Second Amended Complaint, by agreeing to the Accord, they waive any and all rights

to assert any claims or requests for relief on behalf of individual candidates or slate of candidates for violations of the Accord or the 1972 or 1983 Consent Judgments in connection with any particular campaign for public office. This stipulated limitation on the enforcement rights of Paul M. Lurie and Michael L. Shakman is without prejudice and without any admission, stipulation or adjudication as to whether either of them has standing to seek remedies for such violations of the Accord in such capacities, and does not divest them of any other right to seek enforcement of the Accord, the 1972 Consent Judgment, or of the 1983 Consent Judgment with respect to parties other than the City. If Plaintiffs seek to enforce the 1972 or 1983 Consent Judgments with respect to the City, the City reserves the right to assert all arguments and defenses including standing.

(4)    <u>Candidate Rights for Post-Accord Acts</u>. Any candidate for public office who alleges that she or he is a victim of unlawful patronage practices at any time between the date of entry of the Accord and the date the Accord has been ordered terminated by the Court, may pursue legal remedies under the Accord in this Court, or as otherwise provided by law.

F.    <u>Implementation of New Plan; Continued SDM Monitoring</u>. The New Plan that replaces the current Detailed Hiring Plan shall be implemented by the City and be effective on or before April 30, 2007, or as soon thereafter as adopted in accordance with the procedure described in Sections II.A-E. The New Plan shall be fully incorporated by reference into the Accord. The SDM, with her counsel and staff, shall continue to actively monitor the City's compliance with the Accord until its termination.

**G.**    Sunset Procedures

(1)    DHR Certification of Substantial Compliance.  On or after December 31, 2008, the Commissioner of the Department of Human Resources may sign a Certification of Substantial Compliance ("DHR Certification of Substantial Compliance") in a form attached as Exhibit I.F(1) stating that, after appropriate review and inquiry, the Commissioner believes that the City is in Substantial Compliance (as defined below) with the Accord.  The DHR Certification of Substantial Compliance shall be served on the SDM and Plaintiffs' Class Counsel.

(2)    Mayoral Declaration.  On or after December 31, 2008, the Mayor may sign a mayoral declaration in the form attached as Exhibit I.F(2) ("Mayoral Declaration").  The Mayoral Declaration shall be served on the SDM and plaintiffs' counsel.

(3)    SDM's Opinion.  The SDM shall, within 30 days after the receipt of both the Certification of Substantial Compliance from the Commissioner of the Department of Human Resources and the Mayoral Declaration, advise the Court whether, in the opinion of the SDM ("SDM's Opinion"), the City is or is not in Substantial Compliance with the Accord.  The City and Plaintiffs' Class Counsel have the right to challenge the SDM's Opinion and to request a hearing from the Court.

(4)    Conditions to Termination of the Accord.  The Accord shall terminate if (i) the DHR Certification of Substantial Compliance has certified that the City is in Substantial Compliance, in the form attached as Exhibit I.F(1), (ii) the Mayor has signed the Mayoral Declaration, in the form attached as Exhibit I.F(2) (iii) the SDM shall have filed with the Court the SDM's Opinion finding that the City is in Substantial Compliance, and (iv) the

Court has not determined, after such procedures the Court deems appropriate, that the SDM's Opinion is contrary to the preponderance of the evidence.

(5)    <u>Hearing if Negative SDM Opinion</u>.  If the SDM's Opinion finds that Substantial Compliance has not been achieved, the City may request a hearing, and the Accord shall terminate if the Court determines, after such procedures the Court deems appropriate, that the SDM's Opinion that Substantial Compliance has not been achieved is contrary to the preponderance of the evidence.

(6)    <u>Effective Date of Termination; Pending Arbitration Demands</u>.  The effective date of termination shall be thirty (30) days after the delivery to the parties of an SDM's Opinion finding Substantial Compliance if the Plaintiffs have not sought review by the Court.  If either the Plaintiffs or the City have sought Court review of the SDM's Opinion and findings, the effective date of termination shall be the date of the District Court's order finding that Substantial Compliance has been achieved, unless the final order is stayed pursuant to a subsequent Court Order.  Termination of the Accord shall have no effect on any claim, complaint or written demand for arbitration filed prior to termination of the Accord.

(7)    <u>Reinitiating Substantial Completion Process</u>.  If the Accord is not so terminated, it shall remain in effect, and at the end of each successive six-month period, the City may by written request to the Court reinitiate the above SDM Substantial Compliance statements and Opinion process.

(8)    <u>Substantial Compliance Definition</u>.  Substantial Compliance means:

1.    the City has implemented the New Plan, including procedures to ensure compliance with the New Plan and identify instances of non-compliance;

2.      the City has acted in good faith to remedy instances of non-compliance that have been identified, and prevent a recurrence;

3.      the City does not have a policy, custom or practice of making employment decisions based on political factors except for positions that are exempt under the Accord;

4.      the absence of material noncompliance which frustrates the Accord's essential purpose. The SDM and the Court may consider the number of post-Accord complaints that the Inspector General found to be valid. However, technical violations or isolated incidents of noncompliance shall not be a basis for a finding that the City is not in substantial compliance; and

5.      the City has implemented procedures that will effect long-term prevention of the use of impermissible political considerations in connection with City employment.

**H.**     <u>Post-Accord Relief and Defenses.</u>

(1)     <u>Accord Claims and Other Relief.</u>  Applicants, employees, candidates and voters may file for post-Accord claim relief under the post-Accord claim procedure set forth herein or may seek relief as otherwise provided by law.  Voters and candidates may not invoke the Arbitration Process provided in Section IV.B, but they may submit complaints to the Inspector General's Office pursuant to Section IV.A and may pursue other legal remedies under the Accord, in this Court, or as otherwise provided by law.  If any post-Accord claims are brought outside of the Accord, the City reserves the right to raise any and all defenses to such claims, including standing.

(2)     Waiver of Challenge to Accord Validity and Class Member Standing; Preservation of Other Defenses.  The City shall not seek to vacate, appeal or otherwise challenge the validity of the Accord, and the City stipulates and agrees that the Court has continuing jurisdiction and authority to enforce the Accord.  The City expressly waives, covenants and agrees not to assert any argument or claim that any Class Member who seeks relief under the pre or post-Accord claim procedure lacks standing to enforce the Accord or to seek relief under the Accord.  However, the City is not precluded from defending a claim brought under the Accord on the basis that the Class Member is not entitled to relief on grounds other than standing.

II.     **The New Plan.**

   A.     New Plan to Replace Detailed Hiring Plan.  The City will create a New Plan that will replace the current Detailed Hiring Provisions.  When adopted and approved by the Court, the New Plan shall be deemed fully incorporated by reference into this Accord.  The existing Detailed Hiring Provisions, as modified from time to time by the Court, shall continue in effect until the New Plan is adopted and approved by the Court.

   B.     New Plan Development.  The SDM will facilitate the development of the New Plan and may make written objections.  The Plaintiffs may participate and consult with the SDM and may also object to provisions of the New Plan.

   C.     Interim New Plan Components.  As individual components of the New Plan are finalized by the City, the City shall present such components to the Court for approval, subject to final adjustment and approval of the entire New Plan by the Court.

**D.**     Impasse Resolution for New Plan Development.  If, at any time prior to the adoption of the New Plan, the City and the SDM reach an impasse regarding any component of the New Plan, the SDM shall report to the Court the nature of the unresolved issue(s) and shall make a written recommendation as how to resolve such issue(s) for the Court's determination.  The Parties shall have the right to be heard and make submissions concerning the resolution of any unresolved issue(s), and the Court shall then rule on the SDM's recommendation.  Provisions directed by the Court pursuant to such ruling(s) shall become part of the New Plan.

**E.**     Senior Manager Hiring Process.   The New Plan shall provide for a Senior Manager Hiring Process (attached as Exhibit II.E(1)) which shall identify those senior managers covered by such process (attached as Exhibit II.E(2)).

**F.**     Private Secretary Hiring Process.    The New Plan shall provide for a Hiring/Transfer Process for Private Secretary or Assistant to Department or Agency Head and Schedule G Exempt Employees (attached as Exhibit II.F(1)) which shall identify those positions covered by such process.

**G.**     Exemptions.  The New Plan shall include a new list of exempt positions (attached as Exhibit II.G).

(1)     The City may from time to time add positions or delete positions from Part G of the Schedule of Exempt Positions so long as the total number of positions in any of the five categories (VIII-XIII) does not increase by more than 10% of the initial number of positions in such category.  The City shall notify the SDM and plaintiffs' counsel in writing and post on the City's website the revised number of exempt positions by the end

of each calendar quarter. The SDM or the plaintiffs may file with the Court an objection to any such increase as being not eligible for exemption under applicable legal principles.

(2)     If the City transfers, reassigns or reclassifies an individual holding an exempt position to a non-exempt position, the City shall notify the SDM and plaintiffs' counsel in writing with thirty (30) days.

(3)     If the City transfers, reassigns or reclassifies an individual holding an exempt position to a non-exempt position, or reclassifies a previously exempt position to a non-exempt position, the City shall notify the SDM and plaintiffs' counsel in writing within thirty days.   In addition, the position to which the exempt employee is transferred or which has been reclassified as exempt shall continue to be counted as exempt until the person who is so transferred or reclassified leaves the employment of the City.

**III.    Claims Procedure for Alleged Past Violations Pre-Dating Entry of the Accord.**

The following claim procedures set forth in this Section and Section IV below shall apply after final approval of the Accord.

A.    <u>Claim Fund</u>.   The City of Chicago will establish a fund of $12,000,000 to compensate Class Members for any and all injuries of any kind (including but not limited to back pay, front pay, emotional distress, or compensatory damages) allegedly arising out of alleged violations of the 1972 or 1983 Shakman consent decrees between the period of January 1, 2000 and the date of entry of the Accord.

B.    <u>Notice</u>.   The City shall provide a Notice of the Claims Procedure and Notice of Opt-Out Rights to Class Members, in a form and manner approved by the Court, as soon as practicable, and in any event, no later than thirty (30) days following the final approval of the Accord by the Court.   The Notice shall include a Claim

Form, in the form attached as Exhibit III.D, and an Opt-Out Request Form, in the form attached as Exhibit III.C.

**C.**     Opt-Out Rights. Any Class Member who alleges a violation of the 1972 or 1983 Shakman consent decrees occurring prior to January 1, 2000, is not provided relief by this Accord, but may opt out of the Accord and assert whatever rights she or he may have regarding any such claim by submitting a written Opt-Out Request to the SDM. The Opt-Out Request Form (attached as Exhibit III.C) must be received by the SDM by the date specified in the Notice which shall be approximately one hundred twenty (120) days after the final approval of the Accord (the "Opt-Out Date"). Any Class Member who alleges a violation of the 1972 or 1983 Shakman consent decrees arising between January 1, 2000 and the final approval date of the Accord may elect not to participate in the Claims Procedure detailed herein by submitting an Opt-Out Request to the SDM received on or before the Opt-Out Date. Unless such individual Class Member opts-out of the Accord in the manner provided herein, her or his rights regarding any such claim shall be governed solely by the Claims Procedure set forth in the Accord. Opt-Out Requests must be in writing, signed by the Class Member, and must include the Class Member's full name, address and telephone number and must state that the Class Member requests to be excluded from the Accord. Within seven (7) days of the Opt-Out Date, the SDM shall provide copies of all Opt-Out Requests to the Parties.

**D.**     Certain Named Plaintiffs Incentive Awards. The City shall pay each of named plaintiffs Michael Sullivan, Richard Gramarossa, Ann King, Stuart Majerczyk,

Darryn Jones and Kenneth Ayers an incentive award of $25,000.00 (the "Incentive Awards") for their efforts as named plaintiffs on behalf of all class members and for risking possible employment harm and harassment from fellow employees and others. The Incentive Awards shall be paid within fourteen days after approval of the Accord and the expiration of time to appeal or the affirmance of the Accord upon such appeal. Upon payment of the Incentive Awards, and without further documentation, the Incentive Award recipients shall be deemed to have released, pursuant to the terms in paragraphs III.G, any claim to any additional award based on such efforts and risks as named plaintiffs. The Incentive Awards shall be deducted from the $12,000,000 settlement fund created pursuant to Section III.A of this Accord. Each of the named plaintiffs receiving an Incentive Award may submit a claim based on other rationale to the SDM pursuant to the claims procedure in Section III of this Accord for up to $100,000 notwithstanding their receipt of an Incentive Award. However, they may not seek or be paid any additional award from the SDM that is predicated on the factors supporting their Incentive Award.

E.    Claim Forms.  Class Members who wish to file a claim against the City must submit a Claim Form (attached as Exhibit III.D) to the SDM.  All Claim Forms must be received by the SDM by the date specified in the Notice which shall be approximately one hundred twenty (120) days after the final approval of the Accord (the "Claim Deadline").

1.    Contents.  The Claim Form will consist of sworn statements setting forth individual claims including: the date of the alleged violation; a narrative description of

the alleged violation; a description of alleged damages; identifying information including the claimant's full name, address and telephone number; and a release of certain claims as defined below. Claimants must attach any supporting documentation to the Claim Form. Claimants may only submit one Claim Form but may allege facts supporting more than one claim on their Claim Form. No Claimant will receive more than $100,000 total, regardless of the number of claims.

2.    Interpretation. The SDM shall interpret the Claim Forms in a liberal, non-technical manner, and may request further information to facilitate identifying valid claims and eliminating those that are not. Such information shall be deemed part of the Claim Form as of the date filed.

3.    Cooperation of City and Claimants. During the claims review process the City and/or the Claimant shall provide any and all information reasonably requested by the SDM that she determines necessary for assessment of any claim.

4.    Eligibility Period. Only claims of violations between the period of January 1, 2000 and the date of final approval of the Accord shall be eligible for recovery under these procedures. Claims for losses during this period that are not properly presented to the SDM through the prescribed claims procedure will be barred. Claims for violations prior to January 1, 2000 are not eligible for recovery under the Accord.

5.    Availability of Claim Forms. Claim Forms will be available from the SDM, the City and Class Counsel. Claim Forms can be obtained from the SDM's website at www.shakmanmonitor.com and the City's website at www.cityofchicago.org. Copies of all Claims Forms and supporting documentation filed with the SDM will be made available to the Parties for review and copying.

6.     Claim Determination.  Within ninety (90) days of the Claim Deadline, the

SDM in her sole discretion, shall determine whether the claimant is eligible for recovery

and, if so, shall assign a monetary award to the claimant based on the relevant

information presented to the SDM or otherwise in her possession.  No single award shall

exceed $100,000. The decision of the SDM will be final.

7.     Matters to Be Considered.  In determining the assigned award amount for

any claim, the SDM may consider all relevant factors and evidence regarding the claim,

including but not limited to the following, to the extent applicable:  (a) the ratio of

applicants to the actual number of positions filled; (b) the facts presented regarding the

alleged violation; (c) the salary of the position sought or held; (d) the economic benefit of

the action at issue and the number of eligible recipients; (e) the strength of the evidence

presented; (f) the amount of the Claim Fund; and (g) the number of claims submitted.  In

the event additional time is required by the SDM to assess a claim, the SDM shall so

inform the Claimant and the City within the ninety (90) day period, and the time shall be

extended for the period so specified.

8.     Notice of SDM Decision.   The SDM shall inform the parties of her

decision by sending a Notice of Determination to the Claimant, the City and Plaintiffs'

Class Counsel.  The SDM's decision shall be final, and not subject to appeal.

F.     Disbursement of Awards.    Within thirty (30) days following the SDM's

determination on all claims, the SDM shall provide Corporation Counsel with a

list of Claimants eligible for an award, the Claimants' last known mailing address,

and the amount of each award.  Within sixty (60) days of receipt of the SDM's list

of Claimants and awards, the City will mail a check in the amount of the award to

each Claimant who has received an award at her or his last known mailing address. The City shall provide the SDM and Plaintiffs' Class Counsel with a complete list of all amounts paid, the recipients and the dates of payment.

**G.** **Remainder to the City.** Any portion of the fund remaining after payment of all claims will revert to the City.

**H.** **Release.**

1. **Released Claims.** As used herein, the term "Released Claims" means any and all claims, causes of action, rights, actions, suits, obligations, debts, demands, judgments, agreements, promises, liabilities, controversies, costs, expenses or attorneys' fees, of every nature and description whatsoever that have been or could have been asserted in the Action and whether now known or unknown, suspected or unsuspected, arising out of employment decisions of any kind (including, but not limited to, hiring, promotion, termination, assignments, disciplinary decisions, overtime and the like) made by the City with respect to Class Members prior to the final approval of the Accord by the Court and based on the claim that those employment decisions were impermissibly motivated by political considerations, including but not limited to any claims for violations of the 1972 Consent Judgment or the 1983 Consent Judgment.

2. **Released Parties.** As used herein, the term "Released Parties" means: the City, Mayor Richard M. Daley, the City Council, and all of the City's employees, agents, advisors, and attorneys, and their respective heirs, executors, administrators, personal or legal representatives, successors, transferees and assigns.

3. **Final Settlement of Claims.** The obligations incurred by the City pursuant to this Accord shall be in full and final disposition and settlement of all claims, actions,

suits, causes of action, and liabilities relating to any of the facts, transactions, events, occurrences, acts or omissions which have been asserted or could have been asserted by the Class against the Released Parties in the Action.

4.    Effect of Release.   Once the Accord has been finally approved by the Court, the time for appeal has run or all appeals have been finally exhausted and the Accord has been affirmed upon any such appeal, and the City has made the payments from the $12 million fund required by the Accord, all Released Claims that have been or could have been asserted by any member of the Class against the Released Parties or any of them shall be forever extinguished and released, regardless of whether any claim has been filed pursuant to the Claims provisions of the Accord in Section III above.

IV.    **Procedure for Alleged Violations Occurring After the Entry of the Accord.**

Any individual who believes that he or she is a victim of unlawful political discrimination in connection with any aspect of City employment alleged to have occurred during the period that this Accord is in effect may file a complaint with the Inspector General's Office, elect to go to Arbitration under the Accord, and/or file a complaint in federal court.  In order to elect to go to Arbitration under the Accord, the individual must first file a complaint with the Inspector General's Office.  If an individual elects to go to Arbitration under the Accord, that individual is barred from also filing a complaint in federal court.  If an individual files a complaint in federal court for a violation that occurs during the period that this Accord is in effect, that individual cannot elect to go to Arbitration under the Accord.

A.    Accord Complaint Process

(1)    Making an Accord Complaint.  Any individual who believes that he or she is a victim of unlawful political discrimination in any aspect of City employment alleged to have occurred during the period that this Accord is in effect can make an Accord Complaint.  In order

to seek remedies through the Arbitration Procedure detailed in Section IV.B for unlawful political discrimination in connection with any aspect of City employment alleged to have occurred during the period when the Accord is in effect, an individual (hereafter referred to as "Accord Complainant") must submit an "Accord Complaint Form" to the Inspector General's Office ("IGO") attached as Exhibit IV.A(1). The Accord Complaint Form must be received by the IGO within 180 days after the Accord Complainant knew or should have known of the alleged unlawful conduct. The Accord Complaint Form shall include a sworn statement setting forth the Accord Complainant's claims, including:

  a.    the date or dates of the alleged violation;

  b.    narrative description of the alleged violation;

  c.    a description of the alleged damages;

  d.    identifying information including the Accord Complainant's name, address, telephone number; and

  e.    copies of the appropriate supporting documentation, if in the possession of the Accord Complainant.

Nothing in this Accord shall restrict the IGO's authority or ability to investigate any allegations of unlawful political discrimination in City employment received in any other manner established by the IGO, including through the IGO's complaint hotline, through its website complaint system, by fax, by phone or by letter. The filing of an Accord Complaint shall toll an individual's federal statute of limitations as described in paragraph VI.A(10) below.

(2)    Availability of Accord Complaint Forms.  Accord Complaint Forms will be available from the SDM, the City, and Plaintiffs' Class Counsel. Accord Complaint Forms can also be obtained from the SDM's website at www.shakmanmonitor.com, from the IGO's website at www.chicagoinspectorgeneral.org and the City's website at www.cityofchicago.org.

(3)    IGO Investigation.  The IGO shall be responsible for conducting or directing the investigation of the Accord Complaint.  The IGO's jurisdiction, powers and duties to investigate shall be those set forth in the City's IGO Ordinance.

(4)    Distribution to SDM.  Within seven (7) days of receiving an Accord Complaint Form, the IGO shall provide a copy of the Accord Complaint Form to the SDM.  The IGO shall also provide the SDM with the internal IGO case number for the investigation for tracking purposes.  The Accord Complaint to the IGO shall otherwise remain confidential and shall not be disclosed to anyone outside the IGO except as provided for in the IGO Ordinance.  The SDM and her agents shall not disclose the contents or existence of the Accord Complaint to anyone other than the Court except as provided below.  The SDM shall, within 30 days of receipt of the Accord Complaint Form send a "Notice of Rights," in the form attached as Exhibit IV.A(4), to the Accord Complainant.  If Accord Complaint(s) received by the IGO involve an ongoing hiring sequence or a systemic problem, the SDM shall notify the City, if in her discretion such notification is warranted; provided, however, that if the IGO determines, in his sole discretion, that notification to the City would significantly interfere with the IGO's ongoing investigation, the IGO shall instruct the SDM to delay notification to the City until further instruction and the SDM shall do so.  The SDM shall report the IGO's instruction to the Court.  If the IGO makes such a determination, it shall renew such determination every month and shall, for each such determination, report to the SDM.  If the Court determines that the IGO's instruction is unreasonable, the Court shall, after giving the IGO an opportunity to be heard, instruct the SDM to provide notification to the City.  In the event that the SDM delays notification to the City based on the IGO's instruction, the SDM shall not consider the City's failure to act in this

situation in determining whether or not the City is within substantial compliance with the Accord.

(5)    <u>Cooperation with IGO</u>.  The City's Executive branch, its departments and their employees and agents, and the SDM and her agents, shall fully cooperate with the IGO's investigation of the complaint, by, among other things, promptly providing any and all requested documents and information to the IGO, and providing the IGO with access to all requested documents and records in a manner that will preserve the confidentiality of the IGO investigation.

(6)    <u>Timing of IGO Investigation</u>.  The IGO shall investigate Accord Complaints expeditiously.  The IGO shall attempt to complete its investigation within six months after its initiation.  If any investigation is not completed within six months after its initiations, the IGO shall notify the City's Law Department, the SDM, Class Counsel, and the Complainant of the general nature of the complaint and the reasons for its failure to complete the investigation within six months.

(7)    <u>Sustained Cases</u>.  If the IGO finds at the conclusion of its investigation that impermissible political factors were considered in an employment decision ("Sustained Case Report"), the IGO shall report in writing the results of its investigation to the Accord Complainant, SDM, Plaintiffs' Class Counsel, the City's Department of Human Resources, the City's Law Department, and the department head of any other affected department.  The IGO's report shall include the names of all individuals who, according to its investigation, were victims of unlawful political discrimination in connection with any aspect of government employment with the City and the names of any individuals responsible for such discrimination.  The IGO's

24

report shall be accompanied by a Notice of Rights (attached as Exhibit IV.A(4)) and a Arbitration Demand Form (attached as Exhibit IV.B(1)).

(8)    Non-Sustained Cases. If the IGO concludes its investigation without finding that impermissible political factors were considered in an employment decision ("Non-Sustained Case Report") the IGO shall send a report of its findings to the SDM, and to the Accord Complainant. When the IGO sends a report to the Accord Complainant under this paragraph, it shall be sent via certified mail and the IGO shall include a Notice of Rights and a Arbitration Demand Form.

(9)    Quarterly Reports. No later than the fifteenth day of January, April, July, and October of each year, the IGO shall file with the Court a report, accurate as of the last day of the preceding month, indicating: the number of Accord Complaints received since the date of the last report; the number of investigations initiated since the date of the last report; the number of investigations concluded since the last report broken down by Sustained and Non-Sustained Cases; and the number of investigations pending as of the reporting date.

(10)    Tolling During IGO Investigation. The filing of an Accord Complaint shall toll an individual's statute of limitations in federal court as follows. An individual shall have thirty (30) days after he or she receives the IGO's Investigative Case Report to file a complaint in federal court for a violation of the Accord. If an individual elects to file a complaint in federal court, that individual cannot elect to participate in the Arbitration Procedure described below. If an individual elects to file an Arbitration Demand, he or she must do so within thirty (30) days after receipt of the IGO's Investigative Case Report.

**B.**    Arbitration Procedure.

(1)    Written Arbitration Request Due Date.  Any written demands for arbitration must be received by the Law Department within thirty (30) days after the IGO issues its Investigative Case Report.  The Accord Complainant must submit a written demand for arbitration on the Arbitration Demand Form in the form attached as Exhibit IV.B(1).  The Arbitration Demand must state with reasonable specificity sufficient to put the City on notice of the actions that are alleged to violate the Accord and the relief sought.  The Arbitration Demand must also include a copy of the Accord Complaint Form submitted to the IGO and the IGO's Case Report.  The City's Law Department shall provide a copy of any written Arbitration Demand Form to the SDM within seven (7) days of its receipt.

(2)    Settlement Offer.  The Law Department will have twenty-eight (28) days from receipt of a Demand for Arbitration to make a written settlement offer to the Accord Complainant or to notify the Accord Complainant in writing that the City declines to make an offer.  The Accord Complainant and the City can agree in writing to an extension of this date. Settlement offers will be made at the discretion of the Law Department.  Settlement offers may include, but are not limited to, monetary damages, reinstatement or other equitable relief.  If accepted by an Accord Complainant, copies of executed settlement agreements shall be provided to the SDM and Plaintiffs' Class Counsel.  The City's Law Department shall provide a copy of any written Arbitration Demand Form for claims where no settlement was reached to the SDM and Plaintiffs' Class Counsel within seven (7) days of the expiration of the settlement period.

(3)    Timing for Arbitration.  After the expiration of the settlement period, the City shall inform the arbitrator of her or his selection within seven (7) days of the City's receipt of the Arbitration Demand Form by sending the Arbitrator a copy of the Arbitration Demand Form and

accompanying documents.  Within ten (10) days of being notified of her or his selection, the arbitrator shall provide the Accord Complainant, the City's Law Department, and Plaintiffs' Class Counsel notice of her or his selection and a proposed arbitration schedule.  The proposed schedule shall provide for pre-hearing production of documents and information and for completion of the arbitration within one hundred twenty (120) days of the selection of the arbitrator.  The arbitration will be scheduled at a time mutually selected by the Accord Complainant, the City and the arbitrator.  Failure to complete the arbitration within such period, however, shall not affect the validity of the arbitrator's award.

(4)    Arbitrator's Fees; Representatives of Complainant.  The Arbitrator's fees and any costs of administration shall be paid by the City.  The proceeding shall be electronically recorded.  Either party may order a copy of the transcripts at its own expense.  Each party is responsible for the costs of compensating its own witnesses and the costs of any transcript, if desired.  An Accord Complainant may appear on his or her own behalf, be represented by an attorney, or be represented by any other representative of his or her choice.

(5)    Selection of Arbitrator.  The Court will establish a panel of ten arbitrators.  The City and Class Counsel may submit a list of suggested arbitrators.  The arbitrators must be members of the National Academy of Arbitrators or be on a list of arbitrators approved by the American Arbitration Association.  The approved arbitrators will serve on a rotating basis.

(6)    Governing Rules.  Except as modified herein, the arbitration shall be governed by the National Rules for Employment Disputes of the American Arbitration Association.

(7)    Arbitrator's Decision.  The arbitrator must issue a written award, including written findings of fact, within thirty (30) days of the completion of the arbitration hearing.  Copies of the decision shall be provided to the Accord Complainant, the Law Department, the

SDM, and Plaintiffs' Class Counsel. The award shall determine (i) whether the Accord has been violated; (ii) whether the Complainant has met the burden of proof set forth in Mt. Healthy City School Board of Education v. Doyle, 429 U.S. 274 (1977) and any other applicable law; and (iii) the appropriate remedy. Remedies are limited to monetary damages. Prevailing Accord Complainants shall be entitled to reasonable attorneys' fees and costs as determined by the arbitrator. The arbitrator will have no authority to modify any provision of the New Plan or the Accord. The Parties to the Accord recognize and agree that the City has collective bargaining relationships with unions representing City employees, that the Illinois Public Labor Relations Act, 5 ILCS 315, et. seq. ("Act") governs those relationships, and that this Accord will be construed and administered consistent with the Act, to the extent that the construction or administration does not conflict with the United States Constitution or federal civil rights laws. The Parties reserve the right to argue to the arbitrator and the Court the impact of the Act and the collective bargaining agreements negotiated pursuant to the Act on any Accord Complaint. If the arbitrator issues an award that is based on a conclusion that conflicts with a provision of an existing collective bargaining agreement, or if any party objects to the relief granted on the ground that it so conflicts, either party may file an appeal with the Court of the arbitrator's award and decision concerning the effect of the Act and/or a collective bargaining agreement within seven (7) days of the award and the Court shall render its' decision thereon within twenty-eight days of the filing of the appeal.

(8)    Finality of Decision. The Arbitrator's award shall be final and binding upon all parties. The award may be reviewed and enforced, and judgment entered in conformity therewith, solely and exclusively by and in this Court, which shall apply the procedures and

standards set forth in Sections 5/11-5/15 of the Illinois Uniform Arbitration Act, 710 ILCS 5/11-5/15, inclusive, and applicable court decisions under those provisions of that Act.

(9) <u>Waiver</u>. Any Accord Complainant who proceeds under the City's Arbitration Process described herein, shall waive any and all rights she or he may otherwise have arising from the alleged violations of the Accord set forth in his or her written Arbitration Demand Form.

(10) <u>Audit Documentation</u>. The City shall maintain all documentation related to complaints, investigations, and arbitrations arising under Section IV until one year after the Accord has terminated.

## V.    No Admission.

At all times, the City and the Mayor have denied and continue to deny that they have committed any wrongful act or violation of law or the 1972 or 1983 Consent Judgments or any duty of any nature, but have decided to enter into this Accord solely for the purpose of avoiding prolonged and expensive litigation and the drain on the City's resources and employees' time and energy that such litigation would entail, and to finally put to rest any and all claims that were or could have been asserted in the Action, or arising out of the matters set forth in the pleadings, without in any way acknowledging any fault or liability.

## VI.    No Retaliation.

No person shall take any unlawful retaliatory action against any Class Member who exercises any rights provided by this Accord. A Class Member who believes retaliation has occurred may seek relief under the post-Accord process.

## VII.    Compliance Reports to Court.

The SDM shall report periodically, and at a minimum every six months, on the status of compliance with the Accord while the Accord is in effect.

**VIII.  Attorneys' Fees.**

The parties represent that they have not agreed to or discussed the amount of attorneys' fees awardable to Plaintiffs' Class Counsel or costs prior to entry of this Accord, but will attempt to reach agreement as to such amount within 45 days of entry of this Accord for presentation to the Court for its review and approval.  If the parties are unable to reach agreement, the plaintiffs' counsel shall be entitled to petition for an award of fees and the City shall be entitled to assert objections thereto.

**IX.      Termination of the Accord.**

A.      Effect of Non-Approval.  If, for any reason, the Accord does not become final (that is, is finally approved and the time for appeal expires with no appeal being filed or all appellate review has been exhausted and the Accord remains intact), the Parties shall revert to their respective positions immediately prior to the execution of the Accord.

B.      Effect of Termination.  If the Accord is terminated, this Accord shall have no further force and effect.  All negotiations, proceedings and statements made in connection herewith shall be without prejudice to any person or party hereto, shall not be deemed or construed to be an admission by any Party of any act, matter or proposition, and shall not be used in any manner or for any purpose in any subsequent proceeding in the Action or in any other action or proceeding.

**X.      Entire Agreement.**

All prior negotiations and agreements between the parties hereto, with respect to this Accord, are superseded by this agreement and there are no representation, warranties, understandings, or agreements of the parties relating to the subject matter hereof, other than those expressly set forth in this agreement.

ENTER:

_____
Hon. Wayne R. Andersen
United States District Judge


**AGREED TO ON BEHALF OF THE CITY**
**OF CHICAGO BY:**

_____        Date _____

Mara S. Georges
Corporation Counsel for the City of Chicago


**AGREED TO ON BEHALF OF**
**RICHARD M. DALEY:**

_____        Date _____

Tyrone Fahner
One of the Counsel for Richard M. Daley


**AGREED TO ON BEHALF OF**
**THE PLAINTIFFS**

_____        March 21, 2007
Roger R. Fross                           Date
One of the Counsel for the Plaintiff Classes

## LIST OF EXHIBITS

| | |
|---|---|
| A. | Preliminary Approval Order |
| B. | Mayoral Executive Order |
| I.F(1) | DHR Certification of Substantial Compliance |
| I.F(2) | Mayoral Declaration |
| II.E(1) | Senior Manager Hiring Process |
| II.E(2) | Senior Managers |
| II.F(1) | Hiring/Transfer Process for Private Secretary or Assistant to Departmental or Agency Head and Schedule G |
| II.G. | Exempt List |
| III.C | Accord Opt-Out Request Form |
| III.D | Accord Claim Form |
| IV.A(1) | Accord Complaint Form |
| IV.A(4) | Notice of Rights |
| IV.B(1) | Accord Arbitration Demand Form |

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2005 WL 2978736 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Harris v. Board of Educ. of the City of ChicagoN.D.Ill.,2005.Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
Gayle D. HARRIS, Plaintiff,
v.
BOARD OF EDUCATION OF THE CITY OF CHICAGO et al., Defendants.
**No. 05 C 3892.**

Nov. 2, 2005.

Philip Jeffrey Nathanson, Law Office of Philip J. Nathanson, Chicago, IL, for Plaintiff.
James Jordan Seaberry, Jr., Chicago, IL, for Defendants.

*MEMORANDUM OPINION*
DER-YEGHIAYAN, J.
**\*1** This matter is before the court on Defendants' motion to dismiss. For the reasons stated below, we grant the motion in part and deny the motion in part as moot.

BACKGROUND

Plaintiff Gayle D. Harris ("Harris") alleges that she worked for the Chicago Public Schools ("CPS") and that she was promoted to a permanent position as a payroll clerk in the late summer 2002. Harris claims that in early March 2003, she started to ask questions regarding individuals that she thought were overpaid by the CPS and she stated that she objected to the overpayments. Harris claims that on March 19, 2003, she received a "harassing email" from her supervisor. (Compl.Par. 12). Harris alleges that on April 1, 2003, she was "further harassed further [sic] via email." (Compl.Par. 12). According to Harris she subsequently asked her supervisor

about certain payroll practices and thereafter Harris was "again harassed via email." (Compl.Par. 13). Harris claims that afterwards she "was informed" that her manager was attempting to fire her because the "manager felt that [Harris] was not loyal." (Compl.14). Harris further claims that, around this time, she expressed her disapproval of a variety of other conduct by the various employees working for the CPS. Harris claims that she was singled out because of her complaints about the conduct of the CPS employees and was given the "silent treatment" at work. (Compl.Par. 16). On June 30, 2004, the CPS terminated Harris' employment, indicating that the reason for the termination was that workers needed to be laid off in order to reduce the workforce and meet budgetary constraints. Harris brought the instant action in Illinois state court and includes in her complaint a claim alleging a retaliatory discharge in violation of 42 U.S.C. § 1983 ("Section 1983") (Count I), a state law retaliatory discharge claim (Count II), a claim brought pursuant to the Illinois Whistleblower Protection Act, Act, 5 ILCS 395/1, (Count III), an intentional of infliction of emotional distress claim (Count IV), and a Section 1983 due process and equal protection claim (Count V). This action was subsequently removed to federal court.

LEGAL STANDARD

In ruling on a motion to dismiss, brought pursuant to Federal Rule of Civil Procedure 12(b)(6) the court must draw all reasonable inferences that favor the plaintiff, construe the allegations of the complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Thompson v. Illinois Dep't of Prof'l Regulation,* 300 F.3d 750, 753 (7th Cir.2002); *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir.1991). The allegations of a complaint should not be dismissed for a failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



EXHIBIT
C

Not Reported in F.Supp.2d, 2005 WL 2978736 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *See also Baker v. Kingsley,* 387 F.3d 649, 664 (7th Cir.2004)(stating that although the "plaintiffs' allegations provide[d] little detail ... [the court could not] say at [that] early stage in the litigation that plaintiffs [could] prove no set of facts in support of their claim that would entitle them to relief"). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege the "operative facts" upon which each claim is based. *Kyle v. Morton High School,* 144 F.3d 448, 454-55 (7th Cir.1998); *Lucien v. Preiner,* 967 F.2d 1166, 1168 (7th Cir.1992). Under current federal notice pleading standard a plaintiff need not "plead facts that, if true, establish each element of a 'cause of action....' " *See Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994)(stating that "[a]t this stage the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint" and that "[m]atching facts against legal elements comes later."). The plaintiff need not allege all of the facts involved in the claim and can plead conclusions. *Higgs v. Carter,* 286 F.3d 437, 439 (7th Cir.2002); *Kyle,* 144 F.3d at 455. However, any conclusions pled must "provide the defendant with at least minimal notice of the claim," *Id.,* and the plaintiff cannot satisfy federal pleading requirements merely "by attaching bare legal conclusions to narrated facts which fail to outline the bases of [his] claims." *Perkins,* 939 F.2d at 466-67. The Seventh Circuit has explained that "[o]ne pleads a 'claim for relief' by briefly describing the events." *Sanjuan,* 40 F.3d at 251.

## DISCUSSION

### I. Section 1983 Claims Against Duncan and Juarez

**\*2** Defendants argue that the complaint fails to allege any personal involvement by Defendant Arne Duncan ("Duncan") or Defendant Ascencion Juarez ("Juarez") in the alleged constitutional deprivations. The Seventh Circuit has made it clear that "[t]he doctrine of *respondeat superior* does not apply to § 1983 actions...." *Sanville v. McCaughtry,* 266 F.3d

724, 740 (7th Cir.2001). Thus, an individual cannot be held liable under Section 1983 in his individual capacity unless he "participated directly in the constitutional violation." *Hildebrandt v. Illinois Dept. of Natural Resources,* 347 F.3d 1014, 1039 (7th Cir.2003)(stating that "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation"). For a supervisor to be held liable under Section 1983 for acting in his supervisory role, a plaintiff must show that the supervisor directed the constitutional deprivation or that it occurred with his "knowledge and consent." *Id.* (indicating that a plaintiff must show that the supervisor knew "about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye").

In the instant action, the complaint provides that Duncan is the Chief Executive Officer of the CPS and that Juarez is the Chief Human Resources Officer of the CPS. (Compl.Par. 2). However, there are not any specific allegations in the complaint of misconduct on the part of Duncan or Juarez. In fact, other than the initial reference in the complaint to Duncan and Juarez and the mention of their job titles, they are not mentioned at all in the complaint. Harris specifically alleges in the complaint that her " supervisor" harassed her, (Compl.Par. 12), but Harris identifies her supervisor as Defendant Nancy Slavin ("Slavin"). (Compl.Par. 2). Harris also alleges that she was told that her "manager" was trying to get her fired, (Compl.Par. 14), but Harris also refers to Slavin as her manager. (Compl.Par. 4, 7).

Harris, recognizing the lack of allegations concerning personal involvement by Duncan and Juarez, argues that it is "certainly a fair inference" that Duncan and Juarez were involved in the budget layoffs. (Ans.5). However, such an inference in the absence of other evidence is not reasonable. Harris cannot attribute personal involvement in the alleged constitutional violations to Duncan and Juarez simply because of their titles. *See Alexander v. Sheahan,* 1995 WL 573632, at \*1 (N.D.Ill.1995) (stating that the plaintiff's Section 1983 claim was improperly based upon the defendants' "positions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 3

Not Reported in F.Supp.2d, 2005 WL 2978736 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

and titles and not from any personal involvement in the incidents in question" and that "[t]here must be individual participation and involvement by the defendants"). In addition, even if the court inferred that Duncan and Juarez took some role in the layoff process, there are no allegations upon which one could reasonably infer that Duncan and Juarez were doing anything other than performing their jobs lawfully during the layoff process. Harris has not alleged that Duncan or Juarez in any way took part in the alleged plot to unlawfully terminate Harris' employment. The allegations of wrongdoing in the complaint point solely toward Slavin. Since Harris has not alleged any personal involvement on the part of Duncan or Juarez in the alleged constitutional deprivations, we grant Defendants' motion for summary judgment on the Section 1983 claims brought against Duncan and Juarez.

*II. Individual Capacity Section 1983 Claim Against Slavin*

**\*3** Defendants argue that the court should dismiss the **individual capacity** claim against Slavin because Harris has failed to specify that Slavin is being sued in her **individual capacity**. A plaintiff bringing a Section **1983** claim is required to " specify whether suit is brought against the defendant in his **official capacity** or in his **individual capacity**." *Hill v. Shelander,* 924 F.2d 1370, 1372 (7th Cir.1991). If the plaintiff fails to specify the capacity in which the defendant is being sued, the court must determine, after reading the complaint "in its entirety," what was intended by the plaintiff. *Id.* The Seventh Circuit has explained that a court should "ordinarily assume that [a defendant] has been sued in his **official capacity** and only in that **capacity**, ... [and][i]f a plaintiff intends to sue public **officials** in their **individual capacities** or in both their **official and individual capacities** ... he should expressly state so in the complaint." *Kolar v. Sangamon County of State of Ill.,* 756 F.2d 564, 568-69 (7th Cir.1985). In the instant action, Harris did not specify whether she is suing Slavin in her **individual capacity**, **official capacity**, or in both **capacities**. (Compl.5-8). Harris **alleges** wrongdoing by Slavin in the performance of her **official** duties for the CPS. Harris' focus in the

complaint is upon Slavin's **alleged** abuse of her **official** authority. Harris specifically **alleges**, for example, that Defendants acted "under color of state law." (Compl.Par. 17). Based on a reading of the complaint in its totality we conclude that Harris intended to sue Slavin solely in her **official** capacity. Harris complains that such a determination is premature but, as is indicated above, a plaintiff is obligated to plead the capacity in which a defendant is being sued and, in the absence of such a designation, the court must make this determination. Harris chose not to include any designation of the capacity for the claim against Slavin and thus Harris cannot now justly complain when the court makes this determination. Given this determination, there is no need to dismiss an **individual capacity** claim brought against Slavin as Defendants request because, based on the court's determination, Harris did not bring an **individual capacity** claim against Slavin to begin with. Therefore, we deny Defendants' **motion to dismiss** the **individual capacity** claim against Slavin as moot.

*III. Section 1983 Claim against CPS*

Defendants argue that the Section 1983 claim against CPS must be dismissed because Harris bases her claims against the CPS solely upon the doctrine of *respondeat superior*. The doctrine of *respondeat superior* cannot be utilized to hold local governmental units liable for Section 1983 violations. *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipal governmental unit cannot be held liable under Section 1983 "unless the deprivation of constitutional rights is caused by a municipal policy or custom." *Kujawski v. Board of Comm'rs. Of Bartholomew County, Indiana,* 183 F.3d 734, 737 (7th Cir.1999). A claim regarding a local governmental unit's unconstitutional policy, practice, or custom can be based upon: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice, that, although unauthorized, is so permanent and well-settled that it constitutes a ' custom or usage' with the force of law; or (3) an allegation that a person with final policymaking

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2005 WL 2978736 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

authority caused the injury." *Chortek v. City of Milwaukee,* 356 F.3d 740, 748 (7th Cir.2004).

**\*4** We agree with Defendants that the complaint is totally devoid of any allegations referring to a practice, custom, or policy of the CPS that would have led to the alleged constitutional deprivations. Neither are there facts alleged in the complaint that would justify an inference that such a practice, custom, or policy was responsible for the alleged constitutional deprivations. Harris' only argument in response to this issue is that "[i]t should go without saying that a Board of Education could not implement budget cut layoffs without adopting some policy that such layoffs should occur." (Ans.7). Harris grasps at strained inferences and, conceding the deficiencies in her pleadings, argues that certain conclusions are "apparent" from the complaint. (Ans.8). Harris thus acknowledges that she failed to provide any specific allegations to support a *Monell* claim and in the absence of such allegations, the court cannot engage on its own in idle speculation regarding what policies or practices might have been involved in the alleged constitutional deprivations. Therefore, we grant Defendants' motion to dismiss the Section 1983 claim against the CPS. In addition, since the remaining claims are state law claims and the notice of removal does not state that there is diversity jurisdiction we deem it prudent to dismiss the remaining state claims. *Williams v. Aztar Indiana Gaming Corp.,* 351 F.3d 294, 300 (7th Cir.2003); *Wright v. Associated Ins. Cos. Inc.,* 29 F.3d 1244, 1251 (7th Cir.1994); *Timm v. Mead Corp.,* 32 F.3d 273, 277 (7th Cir.1994).

CONCLUSION

Based on the foregoing analysis, we grant Defendants' motion to dismiss the Section 1983 claims against Duncan and Juarez. We conclude that Harris did not bring an individual capacity Section 1983 claim against Slavin and thus deny Defendants' motion to dismiss such a claim as moot. We also grant Defendants' motion to dismiss the Section 1983 claim against the CPS. Finally, we dismiss the remaining state law claims.

N.D.Ill.,2005.
Harris v. Board of Educ. of the City of Chicago
Not Reported in F.Supp.2d, 2005 WL 2978736 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2611629 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendants' Motion to Dismiss (Aug. 24, 2005) Original Image of this Document (PDF)
• 2005 WL 2242537 (Trial Motion, Memorandum and Affidavit) Defendants, Board of Education, Arne Duncan, Nancy Slavin, and Ascencion Tuarez' Motion to Dismiss Plaintiff's Complaint (Jul. 28, 2005) Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.