**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTHONY SARLO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 08 C 2194** |
| **v.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **AL WOJCIK, DAVID DONOVAN, and** | ) | |
| **DAN CAREY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Anthony Sarlo filed a complaint against Al Wojcik, David Donovan, and Dan Carey

alleging retaliation for protected First Amendment conduct under 42 U.S.C. § 1983. Pending

before the court is defendants' motion for summary judgment. For the following reasons, their

motion [#59] is granted.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings

and assess the proof as presented in depositions, answers to interrogatories, admissions, and

affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee's notes. The

party seeking summary judgment bears the initial burden of proving that there is no genuine

issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d

265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use

the evidentiary tools listed above to designate specific material facts showing that there is a

genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir.

2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## BACKGROUND[1]

### I.      General Services

The City of Chicago's Department of General Services ("General Services") provides support to other city departments. Beginning in September 2005, Sarlo was a motor truck driver in General Services.[2] Since 1999, Wojcik has been General Services' Project Administrator.[3] Wojcik, assisted by Wayne Hnatko, the Assistant Director of Building Management, oversees and issues assignments to the five or six General Services drivers. From 2001 to September 2007, Donovan was an Assistant Commissioner of Trades and Engineering in General Services. In summer 2007, he acted as Deputy Commissioner for some period of time and was permanently elevated to this position in September 2007. Carey is the Director of Building

---

[1] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1, as discussed *infra* at 9–11. They are taken in the light most favorable to Sarlo, the non-movant, as discussed *supra* at 1–2.

[2] Sarlo began working for the City of Chicago in January 2000 as a seasonal driver in the Department of Aviation. He became a full-time driver in the Department of Water in October 2001.

[3] Wojcik is the brother of former alderman Michael Wojcik. He was promoted from a laborer position to the Project Administrator position at General Services in 1999.

Operations for General Services and reports to Donovan.  He acted as Deputy Commissioner for the month of July 2007, when Donovan took over until his official appointment.

General Services drivers operate out of three locations: warehouses at North Avenue and Throop Street ("North & Throop") and 1865 Pershing Road ("39th St. Warehouse"), and a senior residence facility, North Park Village ("NPV").  The NPV driver reports directly to NPV, while the other drivers generally begin their day at North & Throop.  The NPV assignment involves transporting senior residents to and from the facility and other designated locations.  The NPV service is provided seven days a week, with drivers rotating through overtime weekend shifts. The warehouse assignments typically involve transporting furniture and other inventory to locations throughout the city.  Drivers worked from 7:00 a.m. to 3:30 p.m., although at times they were directed to work from 6:00 a.m. to 2:30 p.m.  Sarlo began his time at General Services working out of North & Throop.  In late 2005, he agreed to take the NPV assignment for a period of six months.  He continued driving this route until August 2006, at which time he took a medical leave of absence.

## II.     Events from October 2006 to July 2007

Upon returning from his leave of absence to work in October 2006, Sarlo was told to report to North & Throop and to work there and at the 39th St. Warehouse.  Another driver, Ray Helm, who had been transferred to General Services during Sarlo's absence pursuant to a settlement agreement between the City and Teamsters Union Local 726,[4] was assigned to NPV. Although Sarlo testified that he was not particularly concerned about being taken off the NPV

---

[4] Wojcik, Donovan, Carey, and Bailey have all denied participating in this settlement and the decision to transfer Helm from the Department of Streets and Sanitation to General Services.

route, he nonetheless took an interest in Helm's transfer. He claims to have been suspicious of Helm and the manner in which Helm received a transfer due to a friend's experience in attempting to get a transfer to General Services. In April 2006, John Komornick, who worked as a driver in the Department of Transportation, requested a transfer to General Services. In May 2006, he was informed that no openings were available. After hearing that an opening had been posted, he applied for the opening in June 2006. On August 25, 2006, he received a letter informing him that the position would not be filled from the list of bidders due to the city's settlement agreement with Teamsters Union Local 726.

After some discussion with Komornick, Sarlo concluded that Helm had been transferred to General Services as a result of political connections. On October 4, 2006, Sarlo confronted Wojcik at North & Throop, telling Wojcik he "knew how Ray Helm got in here and how Mike Picardi [then Commissioner of Streets and Sanitation] placed a call for him." Ex. 9 to Defs.' L.R. 56.1 Stmt. 32:3–4, hereinafter "Sarlo Dep." He further told Sarlo that he planned to tell the Inspector General about Helm's transfer. Sarlo claims that Wojcik responded by telling him to watch it or he would not have a job, although Wojcik denies this. Donovan and Carey were not privy to this conversation.

Sarlo testified that after his interaction with Wojcik in October 2006, he was given a heavier workload than other drivers.[5] Although he would often be sent out on assignments after lunch, he would notice when he returned to North & Throop that many of the other drivers were

---

[5] Drivers were instructed to complete daily work assignment sheets, although the NPV driver was only directed to do so beginning in November 2008. The City of Chicago, a non-party, produced the records it had. Sarlo claims that these records are incomplete and intimates that some where destroyed so as not to reveal the truth of his claims. Sarlo submitted selected trip sheets for some drivers representing eight different days in November and December 2006.

already at the warehouse.  Sarlo also complained of being sent out on assignments at least once without a laborer to help him with the loading and unloading of his truck.  He did not, however, make any such complaints to Donovan or Carey.[6]

In late 2006 and throughout 2007, Sarlo testified that he complained about these events to the federal monitor's office and the Inspector General's office.  On March 29, 2007, Sarlo faxed a letter to Michi Pena, General Services' Commissioner, in which he claimed to "have been harassed/retaliated against by several City Employees after confronting them with an issue that [he] came across."  Ex. 10 to Sarlo Dep.  He complained about being taken off the NPV route when he returned back to work in October 2006.  He also detailed how he questioned Wojcik about Helm's transfer, Wojcik's response that Sarlo should "mind [his] own business" and that "if [he] didn't leave it alone [he] would be the one sorry," and his conclusions that Helm was placed in General Services as a political favor.  *Id.*  Sarlo wrote that he complained to the Inspector General's office and his union to no avail.  He concluded, "If there is anything you can do to help stop this harassment it would be greatly appreciated."  *Id.*  Sarlo testified that he told the other drivers about his complaint to Pena, knowing that it would spread through the department.

III.    **July 2007 Events and Subsequent Proceedings**

A.      **July 14-15 NPV Weekend Shift**

The NPV route ran seven days a week.  The General Services drivers would generally rotate through the weekend shifts.  If no one was available for a shift, the collective bargaining agreement provided that mandatory overtime could be assigned by reverse seniority.  Sarlo

---

[6] At the time, Carey was not in a supervisory position over Sarlo.

testified that before the weekend in question when no one could work, a driver from another department would take a shift or the service would not run. On July 12, 2007, Wojcik asked Sarlo to work the weekend NPV shift. Sarlo, however, responded that he could not do so because he had other plans. After contacting the other drivers to see if they would take the shift, Wojcik again called Sarlo and informed him that he would have to work the weekend,[7] as Sarlo had the least seniority of the drivers. Sarlo then contacted his union representative, Luther Woodruff, who came to North & Throop to discuss the situation.[8] In at least Woodruff's presence,[9] Wojcik and Sarlo had a confrontation in the loading dock, during which Sarlo told Wojcik he was not going to work the weekend shift. Sarlo proceeded to exit the warehouse with Vanita Rockford, the Director of Administration, and Bill Alicea, another General Services employee, but returned soon thereafter to swipe out for the day. The following day, Carey orally reprimanded Sarlo for leaving the worksite without authorization and discourteous treatment of another City employee.[10]

---

[7] At some point on July 12, a decision was made to have the NPV service run only on the Saturday of that weekend.

[8] The parties disagree on the precise details of with whom Woodruff met. Wojcik testified that he met with Woodruff and Donovan in Donovan's office. Carey testified that Wojcik told him about a meeting involving Donovan, Woodruff, and Sarlo that Wojcik did not attend. Sarlo maintains that Woodruff never met with Donovan that day but instead that Sarlo and Woodruff spoke briefly to Wojcik in the dock area. The precise details are immaterial to the resolution of this motion.

[9] The parties also disagree about who else witnessed the incident.

[10] The City of Chicago's Personnel Rules contain a provision that an employee may be disciplined for
> Leaving the department, office or work site without proper authorization. . . . Failing to call in advance when tardy or not showing up for work. . . . Insubordinate actions, including failure to carry out a rule, order or directive related to the performance of the employee's duty; assaulting, threatening, intimidating or abusing a supervisor either physically or verbally. . . . Any act of violence in the workplace or violation of the City's

(continued...)

**B.     Sarlo's Two-Day Suspension**

Sarlo did not report to work as ordered on July 14, 2007. Wojcik reported this to Francine Bailey, the Assistant Commissioner of Personnel for General Services, whose job responsibilities included handling grievances and disciplinary issues. Wojcik submitted a statement detailing the incident. Bailey then issued a memorandum to Sarlo notifying him of a predisciplinary meeting to be held on July 19, 2007 to address his failure to report to work. Bailey, Sarlo, Wojcik, and Kenneth Brantley, a union representative, were present at this meeting, during which it was determined that Sarlo would be suspended for two days for failing to report to work on July 14. Donovan and Carey were not at this meeting nor did they actively participate in the decision to suspend Sarlo. The following day, Sarlo received a notice of the suspension. Bailey testified that she completed the form, although Wojcik signed it as Sarlo's supervisor.

On July 23, 2007, Sarlo delivered to Pena's assistant a letter addressed to Pena appealing the two-day suspension. He complained that he did not receive a fair hearing and that the suspension was excessive. He requested that he be given a chance to present his version of the events, which he also detailed in the letter, that his suspension be overturned, and that he be reimbursed the two days of lost pay.

On August 12, 2007, Sarlo delivered a letter addressed to Mayor Daley to his office. The letter repeats many of Sarlo's complaints from his previous letters to Pena. He again claimed harassment and retaliation for confronting Wojcik about Helm's transfer. Sarlo stated that he

[10](...continued)
Violence in the Workplace Policy.
Attach. C to Ex. 11 to Defs.' L.R. 56.1 Stmt.

was bringing this to the mayor's attention because he did not want the mayor or his administration "to have any more negative publicity" and because they did "not deserve any bad press for a few employees that believe they are above the city rules." Ex. 5 to Sarlo Dep. In closing, he expressed hope that the mayor would "guide [him] to the right people to get the issues resolved so [he] can return to a non-hostile job and become a less stressed out husband and father." *Id.*

### C. Violence in the Workplace Investigation

In addition to reporting to Bailey that Sarlo did not report to work, Wojcik filed a violence in the workplace ("VIWP") complaint against Sarlo related to their confrontation on July 12, 2007. He listed Carey, Donovan, Woodruff, Roger Fane, Alicea, and Richard Enault as witnesses. In the complaint, Wojcik claimed that Sarlo became "verbally threatening screaming loudly that [Wojcik] was not his supervisor, then he became physically threatening by pointing his finger 2 to 3 inches from my face and threatening to beat [Wojcik] up outside[.] Other supervisors restrained him after about 2-3 minutes." Ex. 8 to Ex. 2 to Defs.' L.R. 56.1 Stmt.

Sarlo also filed a VIWP complaint on July 18, 2007. His complaint stated that he was called by Wojcik and "was threatened that if [he] did not work for another employee on Saturday 7/14/07 [he] would not like what was going to happen to [him]. [Wojcik] then confronted [him] [at] North/Throop and once again threatened [him] regarding the same issue." Attach. D to Ex. 11 to Defs.' L.R. 56.1 Stmt. Sarlo listed only Woodruff as a witness. Donovan, Enault, Carey, and Thomas Rahlfs completed witness incident reports.[11] The reports were forwarded to the

---

[11] Rahlfs claimed not to have any knowledge of the incident and to be unsure why he was completing the report.

City's VIWP coordinator, Robert Keller. Keller reviewed the documentation he received and found that Sarlo had violated the City's VIWP policy. He recommended that Sarlo be suspended without pay for between one and three days or be subjected to the next step of progressive discipline. Based on this recommendation, Sarlo was suspended for three days. Assistant Commissioner Ciaravino signed the suspension notice but testified that he was not involved in the decision to issue the suspension. Bailey testified that Wojcik, Donovan, and Carey did not participate in the decision to issue the suspension, while Ciaravino testified that he assumed the suspension came from the deputy commissioner, although whether this was Donovan or Carey was not specified.

## DISCUSSION

### I.     Compliance with Local Rule 56.1

Before reaching the merits of the parties' motions for summary judgment, the court will address certain deficiencies in the parties' Local Rule 56.1 Statements and Responses. Local Rule 56.1(a) requires the party seeking summary judgment to submit, among other things, a statement of material facts, which consists of short, numbered paragraphs and specific references within each paragraph to the affidavits, parts of the record, and other supporting materials relied on to support the facts set forth in each paragraph. L.R. 56.1(a)(3). The non-moving party must then submit a concise response to the movant's statement of facts. L.R. 56.1(b)(3). Material facts improperly denied by the non-moving party are deemed admitted by the court. *Id.*

In its reply, defendants ask the court to strike certain of Sarlo's responses to defendants' Local Rule 56.1 Statement of Uncontested Facts and certain paragraphs of his Statement of Additional Facts. The court agrees with defendants that Sarlo's responses to ¶¶ 30, 48, 52 of

9

defendants' Local Rule 56.1 Statement of Uncontested Facts are improper because they are not properly supported with citations to the record, are argumentative, or are nonresponsive. *See Cady* v. *Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (explaining that it is inappropriate to make legal arguments in Rule 56.1 statements and responses); *Smith* v. *Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material."). Because the court is entitled to expect strict compliance with Local Rule 56.1 procedures, *Ammons* v. *Aramark Unif. Servs, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004), it deems these paragraphs admitted. *See Smith*, 321 F.3d at 683 (ruling that the district court acted within its discretion when it deemed defendant's statement of facts admitted because the plaintiff failed to support controverted or additional facts with citations to admitted evidence); *Jupiter Aluminum Corp.* v. *Home Ins. Co.*, 225 F.3d 868, 871 (7th Cir. 2000) ("An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission."). Additionally, the court strikes the portions of Sarlo's responses to ¶¶ 10, 12, 13, 21, 25, 28, 31, 32, 33, 34, 35, 36, 37, 39, 40, 41, 44, 46, 52, 55, 61 that are narrative admissions or improperly assert additional facts that should be included in Sarlo's separate statement. *Ammons*, 368 F.3d at 817 (ruling that the non-moving party should place additional facts in a separate statement, not in his responses to a moving party's statement); *Malec* v. *Sanford,* 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("Rule 56.1(b)(3)(B) 'provides the *only* acceptable means of . . . presenting additional facts.'" (quoting *Midwest Imports, Ltd.* v. *Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995))).

The court has also considered Sarlo's Statement of Additional Facts and defendants' objections to these statements presented in their response. Neither parties' submissions are

models of compliance with Local Rule 56.1. Instead of detailing each instance in which the court finds a deficiency, which is made difficult by the number of sentences in each paragraph and response, the court has included in the background section only those portions of Sarlo's Statement and defendants' responses that are appropriately presented, supported, and relevant to the resolution of this motion.

## II.     First Amendment Retaliation Claim Based on Speech[12]

Sarlo asserts that defendants violated his constitutional rights by retaliating against him for exercising his First Amendment rights when he complained about Helm's transfer and what he perceives as retaliation for such reports. In evaluating a First Amendment retaliation claim brought pursuant to § 1983, the court applies a three-step test premised on the Supreme Court's decisions in *Pickering* v. *Board of Education*, 391 U.S. 563, 568, 88 S. Ct. 1731, 29 L. Ed. 2d 811 (1968), and *Connick* v. *Myers*, 461 U.S. 138, 147, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983). *Cygan* v. *Wis. Dep't of Corr.*, 388 F.3d 1092, 1098 (7th Cir. 2004). First, the plaintiff must establish that his speech was constitutionally protected. *Gustafson* v. *Jones*, 290 F.3d 895, 906 (7th Cir. 2002); *see also Connick*, 461 U.S. at 147. Second, the plaintiff must establish that his speech was a but for cause of the employer's decision to take retaliatory action against him.[13] *Kodish* v. *Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 501 (7th Cir. 2010). Third, the

---

[12] Recently, the Seventh Circuit has cautioned against use of the term "retaliation" in connection with First Amendment claims. *See Fairley* v. *Andrews*, 578 F.3d 518, 525 (7th Cir. 2009). Because Sarlo does not claim that defendants have made threats designed to deter future speech but rather have punished him for past speech, the court will use the term "retaliation."

[13] Prior to *Gross* v. *FBL Financial Services, Inc.*, --- U.S. ----, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009), a plaintiff only had to show that his speech was a motivating factor or played a substantial part in defendants' decision. *See, e.g., Gustafson*, 290 F.3d at 906. The Seventh Circuit has clarified that this standard does not survive *Gross* and that instead but for causation is required. *Kodish*, 604 F.3d at 501; *Fairley*, 578 F.3d at 525–26.

defendants have the opportunity to show that they would have taken the adverse action against the plaintiff even in the absence of his comments. *Cygan*, 388 F.3d at 1098. The plaintiff retains the burden of persuasion to show that defendants' proffered reasons were pretextual and that the action was taken in retaliation for plaintiff's speech. *Smith* v. *Dunn*, 368 F.3d 705, 708 (7th Cir. 2004).

A. **Constitutionally Protected Speech**

The determination of whether speech is constitutionally protected is a question of law for the court. *Sullivan* v. *Ramirez*, 360 F.3d 692, 698 (7th Cir.2004) (citing *Kokkinis* v. *Ivkovich*, 185 F.3d 840, 843 (7th Cir.1999)). It entails a two-part inquiry under the *Connick-Pickering* test, in which the court determines first if the speech addressed a matter of public concern and then considers whether the government's interest in providing effective and efficient services outweighs the employee's interest as a citizen in commenting on the issue. *Id.* at 697–98. "Whether a government employee's speech addresses a matter of public concern depends upon 'the content, form, and context of [the speech] as revealed by the whole record.'" *Gustafson*, 290 F.3d at 906–07 (quoting *Connick*, 461 U.S. at 147–48). The content of the speech is the most important of these factors. *Id.* at 907 (citing *Button* v. *Kibby-Brown*, 146 F.3d 526, 529 (7th Cir.1998); *Marshall* v. *Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994); *Belk* v. *Town of Minocqua*, 858 F.2d 1258, 1264 (7th Cir. 1988)). "The 'public concern' element is satisfied if the speech can fairly be said to relate to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee." *Gustafson*, 209 F.3d at 907 (citing *Connick*, 461 U.S. at 146).

Sarlo bases his claim on several instances in which he complained about Helm's transfer and what he viewed as retaliation for such complaints, specifically, (1) his October 4, 2006 statements to Wojcik, (2) his communications with the Inspector General's and federal monitor's offices, (3) his March 2007 letter to Pena, (4) his July 2007 letter to Pena, and (5) his August 2007 letter to Mayor Daley. Defendants argue that Sarlo's speech was not on a matter of public concern, as it solely involved job preferences and personal grievances.

Speech related to public corruption, misconduct, and abuse of power clearly is a matter of public concern entitled to constitutional protection. *See, e.g.*, *Spiegla* v. *Hull*, 371 F.3d 928, 937 (7th Cir. 2004) ("[S]peech alleging government corruption and malfeasance is of public concern in its substance."); *Greer* v. *Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000) ("Whether public officials are operating the government ethically and legally is a quintessential issue of public concern."); *Glass* v. *Dachel*, 2 F.3d 733, 741 (7th Cir. 1993) ("[M]atters of public concern do include speech aimed at uncovering wrongdoing or breaches of public trust."). To the extent Sarlo's speech addressed his belief that Helm's transfer was motivated by political patronage, such speech may be of public concern. This does not end the inquiry, however, as the general subject matter of the speech does not automatically entitle it to constitutional protection. *Nagle* v. *Village of Calumet Park*, 554 F.3d 1106, 1123–24 (7th Cir. 2010). The court must "delve deeper into the precise content, form, and context of speech that admittedly may be of some interest to the public." *Cliff* v. *Bd. of School Comm'rs of City of Indianapolis*, 42 F.3d 403, 410 (7th Cir. 1994). Additionally, because Sarlo's claimed protected speech was generally couched as or coupled with a personal grievance, the court must determine whether this removed it from constitutional protection. "[W]hile speech that is only motivated by private concerns

may not be protected, '[a] personal aspect contained within the motive of the speaker does not necessarily remove the speech from the scope of public concern." *Gustafson*, 290 F.3d at 908 (second alteration in original) (citation omitted).  In determining whether a personal grievance falls within the scope of public concern, the court should consider whether it was "the employee's point to bring wrongdoing to light?  Or to raise other issues of public concern, because they are of public concern?  Or was the point to further some purely private interest?" *Bivens* v. *Trent*, 591 F.3d 555, 561 (7th Cir. 2010) (citation omitted) (internal quotation marks omitted).

Sarlo's direct statements to Wojcik in October 2006 are entitled to constitutional protection.  Although Sarlo may have been upset that he had been removed from the NPV route, he testified that he did not particularly care about the fact that he was not placed back on this route when he returned to work.  Sarlo's statement that he knew how Helm was transferred to General Services because Picardi placed a call for him is not on its face a personal grievance, and defendants have not presented any evidence that would suggest it was actually intended to further a purely private interest.  Instead, the statement explicitly only refers to wrongdoing and political influence within the city's departments.  By stating that he was going to report Helm's transfer to the Inspector General, Sarlo made clear his intent to bring this wrongdoing to light.  Thus, the content of the statement, in conjunction with a lack of record evidence indicating Sarlo spoke only to get his NPV assignment back, convince the court that Sarlo's October 4, 2006 statement involved a matter of public concern.  As defendants do not argue that their efficiency concerns outweigh the public concern, the court finds that Sarlo has adequately shown that he engaged in constitutionally protected speech in this one instance.

14

Sarlo's other claims of protected speech fail, however. From the evidence presented, the court cannot conclude that Sarlo's communications with the Inspector General's or federal monitor's offices related to a public concern and were not just intended to further a purely private interest. At this stage, Sarlo "must do more than generally aver that he 'spoke out' on various issues without providing evidence that the content, form, and context of [that speech] relate to public concerns rather than personal grievances." *Swearnigen-El* v. *Cook County Sheriff's Dep't*, 602 F.3d 852, 862 (7th Cir. 2010); *see also Nagle*, 554 F.3d at 1123–24 (finding that plaintiff had not established that his speech was a matter of public concern where the content, form, and context of the statement were unclear from the record). While Sarlo states that he spoke to the Inspector General's and federal monitor's offices after speaking to Wojcik in October 2006, without providing the content or context, such generality is not enough.

Although it touches on his October 2006 statements to Wojcik about Helm's transfer, Sarlo's March 2007 letter to Pena is more appropriately characterized as a purely personal grievance that "touched tangentially on issues of interest to the public." *Cliff*, 42 F.3d at 411; *see also Milwaukee Deputy Sheriff's Ass'n* v. *Clarke*, 574 F.3d 370, 379, 381 (7th Cir. 2009) (finding speech unprotected where the public component was indirect and tangential to the plaintiff's primary purpose). Sarlo complained of harassment that was directed at him personally and asked for Pena's help in stopping this harassment. Importantly, the letter does not request any action or investigation related to Helm's transfer but instead only addresses the personal effect this had on him. This brings it out of the scope of constitutionally protected speech. *See Marshall*, 32 F.3d at 1219 ("If the speech concerns a subject of public interest but the expression

addresses only the personal effect upon the employee, then as a matter of law the speech is not of public concern.").

Similarly, Sarlo's July 2007 letter to Pena is not of public concern. In the letter, Sarlo seeks to appeal the two-day suspension he received, arguing that he did not receive a fair hearing and complaining of the unprofessional and biased manner in which Bailey addressed him throughout the process. He does not complain that he was required to work on July 14, 2007 due to political affiliation, influence, or lack thereof. To the extent this was Sarlo's intent, it is unstated, tangential, and not entitled to constitutional protection.

Sarlo's letter to Mayor Daley does include some statements that suggest that Sarlo was speaking on something of public concern. He wrote that he was "writing to [Mayor Daley] personally because [he did not] want [Mayor Daley] or [his] administration to have any more negative publicity," and that the Mayor did "not deserve any bad press for a few employees that believe they are above the city rules." Ex. 5 to Sarlo Dep. The letter, however, mirrors Sarlo's complaint to Pena in March 2007, which, as discussed above, does not qualify for constitutional protection. It solely addressed the effect any issue of public concern had on Sarlo: he was being subjected to harassment, including the two-day suspension, and wanted that harassment to stop. *See id.* (reports of harassment not protected where plaintiff "complain[ed] only about [defendants'] hostility toward her personally, rather than more generally about her supervisors' effect on the morale of the office as a whole or some other issue of broader importance"). Further, seeking help internally instead of bringing the issue to light outside the city's

administrative structure has been found to point against constitutional protection.[14]  *See*

*Wallscetti* v. *Fox*, 258 F.3d 662, 667 (7th Cir. 2001) ("The form of [plaintiff's] speech,

contacting her supervisors' internal superiors rather than attempting to bring the harassment into

view of those outside the County's administrative structure, further supports finding that her

complaints are not protected.").  Thus, Sarlo cannot base his first amendment retaliation claim on

this letter either.

### B.    Causation

Because Sarlo demonstrated that his October 2006 speech addressed a matter of public

concern, he must prove that but for this speech, defendants would not have taken retaliatory

action against him.  *Kodish*, 604 F.3d at 501.  To establish causation, Sarlo must first

demonstrate that each of the defendants knew of his speech.  *See Stagman* v. *Ryan*, 176 F.3d

986, 999–1000 (7th Cir. 1999) ("Allegedly protected speech cannot be proven to motivate

retaliation, if there is no evidence that the defendants knew of the protected speech." (quoting

*O'Connor* v. *Chi. Transit Auth.*, 985 F.2d 1362, 1370 (7th Cir. 1993)) (internal quotation marks

omitted)).  Clearly, Wojcik was aware of the speech at issue as it was directed at him.  Donovan

and Carey, however, deny knowledge of Sarlo's complaints to Wojcik about Helm's transfer.

"[I]t would be rare for a plaintiff to have smoking gun evidence that a defendant knew of her

protected speech or for a defendant to admit such knowledge."  *Valentino* v. *Village of S. Chi.*

*Heights*, 575 F.3d 664, 672 (7th Cir. 2009).  Sarlo testified that he told other drivers about his

complaints to Pena in March 2007, which would likely have spread through the department to

---

[14] While Sarlo did testify that he contacted a Fox News reporter, this was prior to July 2007 and immaterial to a finding that the form of Sarlo's speech to Mayor Daley indicates that he was proceeding through internal channels with a personal grievance instead of seeking to bring the harassment he claims to have been subjected to into the public eye.

Donovan and Carey. This is not enough to establish a genuine issue of material fact as to whether or not Donovan and Carey knew of Sarlo's October 2006 statements, as "[i]t is not sufficient that [defendants] *could* or even *should* have known about [Sarlo's speech]; [they] must have had actual knowledge of the [speech] for [their] decisions to be retaliatory." *Luckie* v. *Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004).

Even assuming that all three defendants knew of Sarlo's October 2006 statements to Wojcik, he cannot establish that his speech was the but for cause of the suspensions he received. His suspensions in July and August 2007 were caused by specific events that took place on July 12 and 14, 2007, namely his confrontation with Wojcik about whether he would work that weekend and his failure to report to work when ordered. There is no evidence that these actions would not have occurred without Sarlo having made comments to Wojcik about Helm's transfer in October 2006. It is true that Sarlo's comments could have led to the development of animosity between him and Wojcik that influenced his decision not to fully suspend the NPV service that weekend and instead have Sarlo work on Saturday. Such a link, however, is too attenuated and speculative to create a genuine issue of material fact as to causation. Further, while suspicious timing may be evidence of retaliation, *see Lalvani* v. *Cook County*, 269 F.3d 785, 790 (7th Cir. 2001), the comments here are too far removed from the suspensions to support even an inference of retaliatory motive. *See Swearnigen-El*, 602 F.3d at 862 (speech made over a year prior to adverse action negates causal inference); *Wallscetti*, 258 F.3d at 669 (speech four months prior to adverse action negates causal inference).

Sarlo's attempt to tie his October 2006 to a heavier workload also fails as he has not presented the court with adequate evidence that he was subjected to such a heavier workload.

Sarlo has generally stated that, after he made the comments and for at least several months thereafter, "Wojcik would assign [him] more and more difficult jobs than he assigned other drivers." Ex. 7 to Pl.'s Opp'n. In his deposition, his only support was his observation that when he would come back for the day, the other drivers' trucks would already be in the yard and that he was once sent out without a laborer.[15] Sarlo's testimony is self-serving, and the inference he asks the court to draw is purely speculative. "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of truth of the matter asserted." *Lucas* v. *Chi. Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004) (citation omitted) (internal quotation marks omitted). Without providing specifics regarding Sarlo's workload and the workload of the other drivers, Sarlo cannot survive defendants' motion for summary judgment. *See Petts* v. *Rockledge Furniture LLC*, 534 F.3d 715, 722–23 (7th Cir. 2008) ("Where the nonmoving party bears the burden of proof at trial . . . she must present *specific facts* showing a genuine issue to survive summary judgment."); *Lucas*, 367 F.3d at 726 (finding it was proper not to consider plaintiff's assertions that African-Americans were treated more harshly than non-African-Americans as they received tougher assignments because plaintiff failed to provide specific instances of support). Thus, defendants' motion for summary judgment on this claim will be granted.

---

[15] Any testimony Sarlo gave that others told him that they did not go out on an assignment after lunch is hearsay and thus cannot be considered. *Hemsworth* v. *Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ("The evidence relied upon in defending a motion for summary judgment must be competent evidence of a type otherwise admissible at trial."). Further, any argument Sarlo attempts to make regarding spoliation of evidence regarding trip sheets is not properly before the court. Although select trip sheets were submitted as an exhibit by Sarlo, he did not make any reference to these trip sheets in his briefs or Local Rule 56.1 statement or response to support his claim that he was kept out later than others. The court is not required to "scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie* v. *Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation omitted) (internal quotation marks omitted).

### III.    First Amendment Retaliation Claim Based on Political Affiliation

The same analysis used for Sarlo's First Amendment retaliation claim based on protected speech applies to his claim based on political affiliation. *See Gunville* v. *Walker*, 583 F.3d 979, 983–84 (7th Cir. 2009). It is undisputed that a person's political affiliation is protected by the First Amendment. *Id.*; *Carlson* v. *Gorecki*, 374 F.3d 461, 464 (7th Cir. 2004) ("[P]ublic employees may not be made to suffer adverse job actions because of their political beliefs."). Sarlo claims that he was retaliated against because of his lack of political affiliation. While he refers to defendants' and non-parties' political connections throughout the background section of his response brief, Sarlo makes no response to defendants' arguments that they are entitled to summary judgment on his political affiliation claim. He also does not offer any evidence that would establish that defendants knew of his lack of political affiliation or that this lack of political affiliation was a but for cause of any of the claimed retaliatory conduct. *See Gunville*, 583 F.3d at 984. Claiming that defendants were involved in the political patronage machine does not suffice, as "[i]t is not enough to show only that the plaintiff was of a different political persuasion than the [defendants]." *Hall* v. *Babb*, 389 F.3d 758, 762 (7th Cir. 2004). While the allegations of a climate of political patronage at General Services and throughout the city government may be valid, as presented, they are insufficient to create a genuine issue of material fact as to whether political motivation was the but for cause of the complained of retaliatory actions. Thus, the court will grant defendants' motion for summary judgment on this claim.

### CONCLUSION AND ORDER

For the foregoing reasons, defendants' motion for summary judgment [#59] is granted.

The clerk is instructed to enter judgment in defendants' favor.  This case is terminated.


Dated: September 23, 2010          Enter:  _____

JOAN HUMPHREY LEFKOW
United States District Judge